## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | |
| John G. Berylson and Amy Smith Berylson, ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No.: |
| ) | |
| 1100 Architect, P.C. and David Piscuskas, ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT

## INTRODUCTORY STATEMENT

Plaintiffs, John G. Berylson and Amy Smith Berylson (collectively, the "Berylsons"), hereby bring this action seeking declaratory relief, injunctive relief and monetary damages against Defendants, 1100 Architect, P.C. and its principal, David Piscuskas, FAIA, personally (collectively, the "Defendants"), related to architectural services and associated billing practices provided by the Defendants for a multi-million dollar renovation and construction project located at 38+44 Highgate, Wellesley Hills, Massachusetts (the "Project"), and hereby pleads the following:

## THE PARTIES

1.      The Berylsons are individuals who reside in Wellesley Hills, Massachusetts.

2.      The defendant, David Piscuskas, FAIA ("Piscuskas"), is an individual who resides in Greenwich, Connecticut.

3.      The defendant, 1100 Architect, P.C. is a professional corporation duly organized and existing pursuant to the laws of the State of New York ("1100") with a principal place of

business in New York, New York.  Piscuskas is the co-founder and principal shareholder of 1100 and lead architect for the Project.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity between the parties.

5.      This Court has personal jurisdiction over the Defendants based on their regular and persistent communications with the Berylsons in Massachusetts by letter, email and telephone, their repeated transaction of business with the Berylsons and others in Massachusetts, as well as their persistent conduct outside Massachusetts causing injury in Massachusetts.

6.      Venue in this matter is proper pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this action occurred within this judicial district.

7.      The matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

## FACTS

A.      **Project Background**

8.      The Berylsons own the properties located at 38 Highgate and 44 Highgate in the Town of Wellesley, Massachusetts (the "Town").

9.      In early 2016, the Berylsons decided to extensively renovate their existing home and construct an architecturally unique and distinctive additional premises ("44 Highgate") adjacent and connected to their existing home. The Project also required the demolition of an existing structure on the 44 Highgate site.

10.     The Town required the Berylsons to undertake an extensive zoning review of the Project.

iManageDB1\109089\000005\3676412.v3-3/25/21

11.     The Berylsons knew they needed an architect and a designer that they could trust and count on concerning the zoning requirements, the design of the Project, and overall administration of same.

12.     In early 2016, the Berylsons entered into discussions with 1100 and Piscuskas to act as the architect of record for the Project.

13.     At the outset, the Berylsons made clear that they were relying on 1100 and Piscuskas to act as their "eyes and ears" for the Project. The Berylsons are not experts in design or construction and they stressed to Piscuskas that, as the expert, their trust in him was paramount.  The Berylsons designated Piscuskas as the de facto "Project Executive" or "Chief Executive Officer" of the Project.  Piscuskas readily agreed to this arrangement, and reveled in his trusted position and authority.

14.     The relationship between the Berylsons and 1100 and Piscuskas was more than a contractual one.  John Berylson and Piscuskas were members of the Brown Football Association, they played golf in the same tournaments, and both are members of the Board of the Brown Football Association.  Piscuskas also had worked on the Berylsons' daughter's project in Wellesley.

15.     Piscuskas also benefited from his relationship with John Berylson. Mr. Berylson recommended and ensured that Piscuskas and 1100 were selected to design the Brown University Football Center.

16.     Based on this relationship and trust, the Berylsons relied on 1100 and Piscuskas to, among other things, design and to provide estimates of the cost of the Project.

17.     During this time, Piscuskas and the Berylsons engaged in extensive conversations regarding the design and cost of the Project.

iManageDB1\109089\000005\3676412.v3-3/25/21

18.     The Berylsons made 1100 and Piscuskas aware of their intent to remain in the existing house while the construction was being performed. Indeed, this fact was expressly included and contemplated in the Agreement at Exhibit 1.1. Given the extent of the planned renovations to the existing house and construction of the new structure on 44 Highgate, this required careful planning and orchestration through well-managed phased construction.

19.     1100 and Piscuskas agreed to this plan and took this into account when designing the Project.  Because the Project involved both work on the existing home consisting of traditional New England-style construction materials and finishes, and an incredibly innovative, distinctive and highly complex design and engineering plan for the adjacent structure, the Berylsons knew that they needed to have an architect who had demonstrated the requisite skill to do both and to artistically harmonize all these elements across the entire Project.

20.     Both 1100 and Piscuskas represented that 1100 had the unique talents to handle the demands of the Project, and to create the unique concept and design the Berylsons were seeking, and the Berylsons relied on these statements.

21.      On April 27, 2016, 1100 submitted to the Berylsons a proposal ("Proposal") setting forth, among other things, certain design services and a cost for the construction.

22.     In April 2016, 1100 estimated that the construction cost for the Project (the "Cost of the Work") would be between $10,575,000 and $12,740,000.  The Berylsons reviewed and modified the Proposal, and the modifications were accepted by 1100 ("Modified Proposal"). A true copy of the Modified Proposal is attached hereto as **Exhibit A**. The Berylsons relied on the estimates in the Proposal and Modified Proposal.

23.     In addition, as part of 1100's services, 1100 was primarily responsible for locating and vetting a highly qualified general contractor or construction manager (collectively, the

"Contractor") to perform the construction work. Just as the Project architect required the requisite skill and experience to handle the complexities and demands of the Project, the Contractor had to similarly possess the requisite skills and experience to handle old and new, traditional and highly modern, unique and complex design, construction, engineering and materials. There are very few such qualified Contractors in the high-end residential Massachusetts market, and those that exist are seldom available.

24.     Based upon and in reliance on the foregoing, on July 6, 2016, the Berylsons and 1100 entered into a Standard Form of Agreement Between Owner and Architect AIA Document B101™ ─ 2007, as modified by the parties (the "Agreement") for the Project.  A true copy of the Agreement is attached as **Exhibit B**.

25.     The Agreement provided that the Berylsons would compensate 1100 for completion of its Basic Services, as defined by the Agreement, a fee of 18.5% of the Cost of the Work ("1100's Fee"). 1100's Fee is consistent with the highest rates paid for architectural services for residential Projects of this nature.

26.     The Agreement is comprised of the Agreement, the Modified Proposal, and other enumerated exhibits, including a Design Schedule, dated June 15, 2016.

**B.     The Agreement**

27.     The Agreement sets forth the various duties, obligations and services of 1100 and the duties and obligations of the Berylsons.

28.     The Agreement required 1100 to, among other things:

        a.     attend Project meetings, communicate with members of the Project team and report progress to the Berylsons (Ex. B, Art. 3, §3.1);

5

b.      attend meetings and/or participate in telephone calls with the Berylsons
and the Contractor as required to facilitate the successful design and
construction of the Project (Ex. B, Art. 3, §3.1.7);

c.      prepare a preliminary evaluation of the Berylsons' program, schedule,
budget for the construction work, and the Project site (Ex. B, Art. 3,
§3.2.2);

d.      notify the Berylsons of (i) inconsistencies discovered in the foregoing
information, and (ii) other information or consulting services that may be
reasonably needed for the Project (Ex. B, Art. 3, §3.2.2);

e.      consider the value of alternative materials, building systems and
equipment, together with other considerations based on program and
aesthetics, in developing a design for the Project that is consistent with the
Berylsons' program, schedule and budget for the Cost of the Work; (Ex.
B, Art. 3, §3.2.5.2);

f.      provide estimates of the Cost of the Work at various times during the
Project (Ex. B, Art. 3, §§ 3.2.6, 3.3.2, 3.4.4, 3.4.5, 6.2, 6.3, Ex. 1.1);

g.      meet with the Berylsons, the Contractor, and any other parties designated
by the Berylsons, in order to discuss and develop value engineering and
other suggestions, comments, requests or preferences contained in the
Construction Documents (Ex. B, Art. 3, §3.4.5);

h.      assist the Berylsons in establishing a list of prospective contractors, and
assist the Berylsons in (i) obtaining either competitive bids or negotiated

proposals; (ii) determining the successful bid or proposal, and (iii) awarding and preparing contracts for construction (Ex. B, Art. 3, §3.5.1);

i.    advise and consult with the Berylsons during the construction of the Project (Ex. B, Art. 3, §3.6.1.2);

j.    develop a budget with the Berylsons and prepare a design in accordance with the Berylsons' budget (Ex. B, Exhibit 1.1);

k.    review and negotiate, with input and agreement from the Berylsons, construction costs at various intervals in the preparation of the construction documents (Ex. B, Exhibit 1.1);

l.    in devising a budget, 1100 was required to evaluate and take into consideration the Berylsons' needs and requirements for the Project (Ex. B, Exhibit 1.1);

m.    report to the Berylsons, no less than 3 times a month, the status of the Project (Ex. B, Exhibit 1.1);

n.    undertake the Master Plan of the development of the Project site, including the 44 Highgate addition (Ex. B, Exhibit 1.1);

o.    procure Town approvals/permits (Ex. B, Exhibit 1.1); and,

p.    keep the Berylsons regularly advised concerning the scope of the construction, the cost of same, and any issues related thereto (Ex. B, Exhibit 1.1).

29.    In sum, 1100 and Piscuskas were required to keep the Berylsons notified, informed and educated as it concerned the Cost of the Work and the Project overall.

30.     1100's schedule provided that its contractual services to the Berylsons would be complete by mid-March 2019.  A true copy of the Design Schedule is attached as **Exhibit C**. The Agreement further anticipated that Substantial Completion of the Project would occur in or about May 2019.  (Ex. B, Art. 1, § 1.2.2).

31.     The Agreement also provided that the performance of any Additional Services, those services outside of the Basic Services, including those arising from any delays not caused, in whole or in part, by 1100 or after the expiration of the Agreement, must *first* be *authorized* by the Berylsons *in writing*; otherwise such Additional Services were to be performed at 1100's sole cost and risk. (Ex. B, Art. 4, § 4.1).

32.     The Agreement allows the Berylsons to review and audit 1100's records as they concern the performance of Additional Services, services performed on an hourly rate basis, and reimbursable expenses charged to the Project. (Ex. B, Art. 11, § 11.9.4).

33.     Finally, the if the services contemplated by the Agreement were not completed within 39 months, through *no* fault of 1100, then extension of services beyond that time shall be compensated as Additional Services.  (See ¶39, above).  (Ex. B, Art. 4, § 4.3.3).

34.     Despite the foregoing, and 1100's obligations to protect the Berylsons, 1100 and Piscuskas breached the Agreement, and through 1100's and Piscuskas' acts, misrepresentations and omissions, the cost of the Project skyrocketed and the Project was plagued by several different delays attributable to 1100.

### 1100'S DELAYS AND FAILURE TO PERFORM

**C.      1100 Failed to Timely Perform its Design Services**

35.     The Design Schedule sets forth the schedule for the performance of 1100's services under the Agreement and includes allowances for periods of time required for the

Berylsons' review, for the performance of any consultants, and for approval of submissions by authorities having jurisdiction over the Project. (Ex. B, Art. 3, § 3.1.3; Ex. C).

36.     Under the Agreement, the time limits established by the Design Schedule shall not, except for reasonable cause and agreed to by the other party, be exceeded by 1100 or the Berylsons.  (Ex. B, Art. 3, §3.1.3).

37.     The Agreement obligated 1100, only with the Berylsons' written approval, to adjust the schedule as the Project progressed, allowing for changes in scope, character or size of the Project requested by the Berylsons, or for delays or other causes beyond 1100's reasonable control up to the time in which construction commenced. (Ex. B, Art. 3, §3.1.3).

38.     The Design Schedule contemplated that construction of the Project would commence on or about July 15, 2017. (Ex. C).

39.     Accordingly, pursuant to the Design Schedule, the Agreement obligated 1100 to complete certain Basic Services, including but not limited to, preparing certain Construction Documents, by July 15, 2017.  (Ex. C).

40.     1100 failed to prepare and complete the Construction Documents required by the Agreement in a timely manner, delaying the Berylsons' selection of a Contractor, the commencement of construction, and the performance of same.

41.     As part of 1100's Basic Services under the Agreement, pursuant to the Design Schedule, 1100 was obligated to prepare for the Berylsons' approval Schematic Design Documents within five (5) months of the date of the Agreement, or by early November 2016. (Ex. C).

42.     Upon information and belief, 1100 failed to complete the Schematic Design Documents in a timely manner, and it did not complete the Schematic Design Documents until June 2017.   A delay of eight (8) months.

43.     Pursuant to the Agreement, 1100's services for the performance of the Schematic Design Documents represented 22% of 1100's Fee. (Ex. B, Art. 11, § 11.5).  By the time 1100 allegedly completed the Schematic Design Documents in June, 2017, 1100 had already billed the Berylsons $836,320.25 or approximately 40% of what it had initially calculated would amount to 1100's Fee for 22% of the work in preparing the Schematic Design Documents in the amount of $2,127,500.  1100's Fee percentage of $2,127,500 represented an estimated total Cost of the Work in the amount of $11,500,000.

44.     Similarly, as part of 1100's Basic Services under the Agreement, 1100 was obligated to prepare Design Development Documents for the Berylsons' approval within four (4) months, or on or about March 15, 2017. (Ex. C).

45.     Upon information and belief, 1100 failed to complete the Design Development Documents in a timely manner, and it did not complete the Design Development Documents until October 2017.  A delay of seven (7) months.

46.     Pursuant to the Agreement, 1100's services for the performance of the Design Development Documents represented 22% of 1100's Fee. (Ex. B, Art. 11, § 11.5).  By the time 1100 allegedly completed the Design Development Documents in October, 2017, 1100 had already billed the Berylsons $1,153,706.25 or approximately 50% of what it had initially calculated would amount to 1100's Fee percentage for 44% of the work through the Design Development Documents in an amount totaling $2,312,500.  1100's Fee percentage of

$2,312,500 represented an estimated total Cost of the Work in the amount of $12,500,000, an increase of 8.6%.

47.     As part of 1100's Basic Services under the Agreement, 1100 was obligated to complete Construction Documents for the renovation portion of the Project by June 15, 2017, in order to allow construction at 44 Highgate to commence on or about July 15, 2017. (Ex. C).

48.     Construction Documents for the entirety of the Project were to be complete, pursuant to the terms of the Agreement, by December 15, 2017. (Ex. C). 1100 failed to complete the Construction Documents in a timely manner, and in fact, to date, they remain incomplete. For this reason, 1100's delay in completion of the Construction Documents is on-going and continuing in nature.

49.     As of the filing of this action, the Berylsons are informed by their Project Manager, Richard Roberts ("Roberts"), that the drawings remain only 70% complete, notwithstanding that, as of January 2020, the Berylsons paid 1100 in full for the complete design portion of 1100's services.  (See 1100's January 2020 invoice attached hereto as **Exhibit D**, wherein 1100 represents that it has completed all services for the Project, except Construction Administration).  Specifically, although 1100 has produced over 800 pages of drawings, they only contain 70% of the information that is required to complete the Project and lack details regarding finish scheduling.

50.     When 1100 finally did submit the Construction Documents to the Berylsons, the Construction Documents were incomplete and lacked sufficient detail that would allow the Contractor to provide an accurate price for the Cost of the Work or complete the construction of the Project.

11

51.     The Agreement required 1100 to obtain the Berylsons' written approval and authorization for any adjustment to the budget for the Cost of the Work for each phase of its Basic Services *before* proceeding to the next phase.  1100 failed to ever obtain the Berylsons' written approval of the Schematic Design Documents, the Design Development Documents, or the Construction Documents and authorization of any adjustment to the budget for the Cost of the Work as 1100 purportedly completed each phase of its Basic Services.

52.     This obligation on the part of 1100 was intended to ensure that the design of the Project and the estimated Cost of the Work were consistent with the Berylsons' prior instructions and expectations.

53.     Based on the Construction Documents 1100 did provide, construction of the Project commenced in the summer 2018, or nearly ten (10) months late (July 15, 2017 deadline) per the terms of the Agreement.

54.     Pursuant to the Agreement, 1100's services for the performance of the Construction Documents represented totaled 23% of 1100's Fee. (Ex. B, Art. 11, § 11.5).  By the time 1100 allegedly completed the Construction Documents and when construction commenced, 1100 had already billed the Berylsons $1,754,604.75 or approximately 60% of what it had initially calculated would amount to 1100's Fee percentage for 67% of the work through the Construction Documents in an amount totaling $2,941,500.  However, 1100 was not catching up on its work relative to payments by the Berylsons.  1100's Fee percentage of $2,941,500 now represented a much higher estimated total Cost of the Work in the amount of $15,900,000, a staggering increase of 27.2%.

55.     Pursuant to the Agreement, 1100's services in the performance and preparation of the Construction Documents totaled 23% of 1100's Fee.  (Ex. B, Art. 11, § 11.5). Under the

12

Agreement, 1100 would also earn 3% of the 1100 Fee in connection with the bidding and negotiation of the construction contract by and between the Berylsons and Contractor. (Ex. B, Art. 11, § 11.5). The remaining 30% of 1100's Fee would be earned in connection with 1100's Construction Administration services, whereby 1100 would administer the aforementioned construction contract with Contractor.  (Ex. B, Art. 11, § 11.5).

56.     The services outlined above that entitled 1100 to a percentage portion of its fee under the Agreement were to be completed by March 2019. (Ex. C).

57.     Pursuant to the terms of the Agreement, if the services covered by the Agreement were not completed within thirty-nine (39) months of the date of the Agreement (or by October 6, 2019), through no fault of 1100, extension of 1100's services beyond that time would be compensated as Additional Services (*i.e.*, hourly rate basis).  However, 1100's delays as detailed above in connection with drafting the required Instruments of Service alone, resulted in at least ten (10) months of delay which were 1100's fault.  Approximately another seven (7) months of delay ensued before construction began.

58.     By October 6, 2019, construction of the Project was approximately only 8% complete.  As outlined below, the apparent slow rate of completion of the construction was also due to various acts and omissions of 1100.

59.     While construction of the Project was approximately only 8% complete by October 2019, and the Instruments of Service remained incomplete, 1100 had already billed the Berylsons 41% of the remaining 30% portion of its fee that pertained to Construction Administration.

60.     By this time, it was clear that while 1100 was delayed in completing the Instruments of Service, it was "ahead" of the Berylsons in collecting its remaining fees.

**D.     1100 Failed to Timely Secure Zoning Approval with the Town.**

*Delays Attributable to Large House Review*

61.     An initial requirement for the Project, and one spearheaded by Piscuskas and 1100, was securing zoning approval from the Town.

62.     Upon information and belief, for certain construction projects, the Town requires a "Large House Review" before the project may commence.

63.     In sum, based on the Town's website, "if the size of a proposed home (calculated as Total Living Area plus Garage Space (TLAG) exceeds the established TLAG threshold for the district in which the property is located, the home must complete the Large House Review process and be approved by the Planning Board before a building permit may be issued." (Section 16D, Town Zoning By-laws).

64.     This Zoning By-law was in effect in early 2016 and the Project was required to undergo a Large House Review.

65.     1100 and Piscuskas were tasked with undertaking the Large House Review, and obtaining approval of same.  1100 was obligated to know and understand the zoning requirements for the Project imposed by the Town, both initially, and over the course of the entire Project.

66.     Of note, 1100 and Piscuskas were intimately aware of the Large House Review process, specifically, because they had to undergo the same review process in connection with the construction of the Berylsons' daughter's home also located in the Town. 1100 was the architect of record for that project as well.

67.     Based on 1100's own schedule, it was supposed to submit the Large House Review application package to the Town in early November 2016.

68.     Instead, the Large House Review application was submitted on April 13, 2017.

14

69.     Ultimately, the Large House Review application was approved in July 2017, resulting in a 3 month delay to the Project.

70.     While the Large House Review application was being reviewed, notice was provided by the Town that an additional zoning and review process may be required for the Project.

71.     The delay in achieving Large House Review approval, directly resulted in an additional 5 month delay to the Project, a delay *that was* foreseeable by 1100.

### Delays Attributable to Historic Preservation Demolition Review

72.     1100 also failed to recognize that the demolition of the structure on 44 Highgate was subject to review by the Town's Historical Commission (the "Historical Commission").

73.     The Historical Commission, which consists of a seven member board who are appointed by the Town's Board of Selectmen, serve as the primary advocate for the protection of the Town's historical assets.

74.     The Historical Commission's stated purpose is to preserve and protect tangible evidence of the architectural, aesthetic, cultural, economic, political and social history for the Town.

75.     With the purpose of decreasing the number of historically significant buildings that were being torn down within the Town of, in July, 2016, the Historical Commission launched a petition to gather support for the acceptance of a proposed "Historic Preservation Demolition Review By-law" ("Demolition By-law").

76.     Specifically, the proposed Demolition By-law required that any owner within the Town who intended to demolish a building that was built on or prior to December 31, 1949, was

required to first seek additional review by the Historical Commission before proceeding with the proposed demolition.

77.    Accordingly, and based on the clear and unambiguous terms of the proposed Demolition By-law, 1100 should have been aware that the Project was subject to review by the Historical Commission as the Project required demolition of an existing home located at 44 Highgate and which was built at or near December 31, 1949.

78.    To raise public awareness, the Historical Commission posted their petition in favor of the Demolition By-law directly on the Town's website and which was available to the public, including 1100, beginning in July, 2016.

79.    Over the course of the following months, the Demolition By-law was heavily discussed and debated given the significant implications it would have on future construction projects within the Town.

80.    However, during this time, and prior to its approval by the Town, 1100 failed to appreciate or ignored the impact the Demolition By-law would have on the Project and did nothing to preemptively address the clear requirements of the Town.

81.    Rather, it was clear that 1100 and Piscuskas were not aware of the Historical Commission's zoning requirements and the Demolition By-Law.

82.    Despite 1100's failure to recognize its significance or proceed with the demolition at 44 Highgate, support for the proposed Demolition By-law continued to increase within the Town.

83.    After ten months of debate and discussion, the Demolition By-law was passed by the Town on April 24, 2017 at its 2017 Annual Town Meeting.

84.     Still, 1100 did nothing to address the oncoming and clear adverse impacts the Demolition By-law would pose to the Project.

85.     Although it was passed on April 24, 2017, the Demolition By-law did not take effect until after it was approved by the Massachusetts Attorney General's Office and was publicly posted by the Town Clerk.

86.     However, by April 2017, 1100 had only then submitted the Large House Review application. It could not, and was not, in a position to react to the soon-to-be effective Demolition By-law.

87.     What's worse, there is nothing in the record to indicate that 1100 had any appreciation that the Demolition By-law would impact the Project, despite months of public notice.

88.     The Demolition By-law was published by the Town Clerk on August 15, 2017 and became effective as of that date.

89.     As such, as of August 15, 2017, the Demolition By-law required that any "[o]wner seeking to Demolish a Building shall first file an Application" with the Historical Commission.

90.     Such conditions, and review by the Historical Commission, were not required prior to August 15, 2017 and the existing home at 44 Highgate could have been demolished before that time without review and approval by the Historical Commission.

91.     By then it was too late, the Project was now subject to the Demolition By-law.

92.     In approximately October, 2017, the Berylsons' demolition contractor applied for a demolition permit for the demolition of the structure on 44 Highgate. Since the demolition

contractor's application for a demolition permit occurred after August 15, 2017, and because the Large House Review process was delayed, this triggered Historical Commission review.

93.     Accordingly, an Application for Eligibility Notice was submitted to the Historical Commission on behalf of the Berylsons on November 9, 2017; nearly three months after the Demolition By-law took effect, which sought to determine if the demolition could take place.

94.     Later, on November 14, 2017, the Historic Commission rendered an Eligibility Notice which determined that 44 Highgate was an Eligible Building pursuant to the Demolition By-law and, therefore, subject to its review before the required demolition could proceed.

95.     As 44 Highgate was an Eligible Building, on November 16, 2017, the Berylsons were required to not only appeal the Eligibility Notice, bus also seek a Preservation Determination from the Historical Commission.

96.     On December 11, 2017, the Historical Commission heard the Berylsons' appeal of the Eligibility Notice, as well as their application for a Preservation Determination.

97.     At that time, and seventeen (17) months after the parties entered into the Agreement, and four months after the Demolition By-law took effect, the Historical Commission allowed the Berylsons' appeal of the Eligibility Notice and which permitted the home located at 44 Highgate to be demolished.

98.     Had 1100 timely completed the Large House Review process, and recognized the implications of the Demolition By-law to the Project, the resulting delays could have been entirely avoided.

99.     Due solely to 1100's failure to timely appreciate the need for the Historical Commission's approval, the Project was delayed for an additional five (5) months.

100.     Together with the delays arising from the Large House Review process, the delays attributable to the Demolition By-law, accounted for approximately eight (8) months of delay to the Project.

**E.     After 1100 Recommended That Sea-Dar Enterprises, Inc. be Retained as the Project's General Contractor, the Cost of the Work Increased to $16,100,000.**

101.     In the midst of its sluggish design services and pursuit of the required zoning approvals from the Town, 1100 began to secure bids from various Contractors for the Project on behalf of the Berylsons.

102.     Specifically, under the Agreement, 1100 was required to provide the Berylsons with "a list of prospective contractors." Indeed, §3.5.1 of Agreement required that 1100:

> …assist the Owner in establishing a list of prospective contractors. Following the Owner's approval of the Construction Documents, the Architect shall assist the Owner in (1) obtaining either competitive bids or negotiated proposals; (2) confirming responsiveness of bids or proposals; (3) determining the successful bid or proposal, if any; and, (4) awarding and preparing contracts for construction.

103.     However, given the design, engineering complexity and interplay of both modern and traditional building materials, construction techniques and nuances associated with the Project work, only certain, highly qualified general contractors possessed the requisite skill, expertise and experience to complete the Project to the exacting standards required by the Agreement and Project design

104.     Due to the uniqueness of the design, the size of the Project, and its location in the Town, Piscuskas told the Berylsons that several highly qualified Contractors would likely bid on the Project.

105.     Accordingly, Piscuskas, on behalf of 1100, put the Project out to bid.  To the Berylsons' and 1100's surprise, several prominent Boston area Contractors did not even submit bids or show interest in the Project.

106.    Upon information and belief, the dearth of qualified Contractors was the result of 1100's involvement on the Project.

107.    In the end, only four Contractors, submitted bids on behalf of the Berylsons' Project, including Thoughtforms Corporation (Acton, Massachusetts) ("Thoughtforms"), C.H. Newton  Builders, Inc. (Wellesley Hills, Massachusetts) ("C.H. Newton"), Shawmut Design and Construction (Boston, Massachusetts) ("Shawmut") and Sea-Dar Enterprises, Inc. (Boston, Massachusetts) ("Sea Dar").

108.    The Berylsons were familiar with Thoughtforms, as it had served as the general contractor on their daughter's project in Town.  Their daughter's project was very sleek and contemporary, and did not have the degree of complexity as the Project, nor did it employ the combination of traditional and modern design and very high-end materials of the Project.

109.    The Berylsons were also familiar with C.H. Newton. They had friends and relatives who employed C.H. Newton on Cape Cod, and in the Boston area, but C. H. Newton was known for more traditional New England style homes.  Like Thoughtforms, C.H. Newton lacked the requisite skill, demonstrated experience and/or reputation for high quality construction that the Project's complex and intricate design of traditional and modern (and the Berylsons) required.

110.    Shawmut is considered to be an excellent general contractor.  However, after repeated requests, Shawmut was never able to secure or arrange for in-person site visits from the customers for its most relevant projects.  The Berylsons were not going to consider a general contractor without seeing the contractor's work first-hand, and often when people are unwilling to grant access, it can be a sign of lingering problems.  The Berylsons did not want a builder who could not arrange site access from actual customers.

111. Realizing that 1100 failed to attract and provide a sufficient number of highly qualified Contractor bidders for the Project to offer the Berylsons a choice, Piscuskas proceeded to advocate for the only remaining bidder, Sea-Dar. Sea-Dar had some experience in modern materials and construction, and was arguably the only potentially qualified Contractor to bid the Project.

112. The Berylsons were concerned. Sea-Dar had been a bidder on their daughter's project. At that time, Piscuskas and 1100, urged the Berylsons' daughter to select Sea-Dar as her general contractor for her project. However, the project manager on the Berylsons' daughter's project, Robert Carlson, who later became the Berylsons' project manager for the Project, strongly objected to their selection.

113. Mr. Carlson reported that Sea-Dar had a poor reputation in the industry for paying its sub-contractors. Mr. Carlson further advised that if Sea-Dar were selected as general contractor, premier, "A-team" sub-contractors in various trades would refuse to work on the Berylsons' daughter's project. Ultimately, the Berylsons' daughter decided not to select Sea-Dar based on Mr. Carlson's advice.

114. Piscuskas and 1100 knew they had to overcome these concerns given that Sea-Dar was the only remaining potentially qualified bidder left for the Project. On this basis, Piscuskas arranged for 1100 representatives to take Amy Berylson on a tour of several Sea-Dar projects in an effort to persuade her that Sea-Dar had the requisite skills and experience for the Project.

115. Piscuskas, his associate, and Mrs. Berylson visited and interviewed Sea-Dar customers, and reviewed various Sea-Dar projects including several luxury gut-renovations of Brownstone homes located in the Back Bay neighborhood in Boston, including one owned by Mrs. Berylson's sister, as well as a project on Newbury Street in Boston which involved the

attachment of a modern structure to a historic Brownstone building. They were informed that a high-end residential historic home project in Brookline, Massachusetts, where Sea-Dar would be constructing an innovative wrap-around staircase and would incorporate modern materials into the old structure of the home was planned.  From what was reviewed and what she was told during these discussions, Mrs. Berylson believed Sea-Dar's work was excellent.

116.    Despite these tours and interviews, Mr. Carlson continued to urge the Berylsons *not* to engage Sea-Dar.  He knew that "A-team" subcontractors were required for the Project, and feared they would shun the Project.  In fact, he had already determined that one, an indispensable plasterer, Virgil Van Gervin, whose skills were essential to complete intricate plaster work inside the dome structure designed for the Project, had expressed a refusal to work for Sea-Dar.

117.    After completion of Mrs. Berylson's due diligence, Piscuskas and 1100 recommended to the Berylsons that they retain Sea-Dar as the Project's Contractor.

118.    The Berylsons weighed Piscuskas' and 1100's recommendation and the results of the tour visits and interviews, against their concerns that Sea-Dar may not be equipped to complete the Project based on the objections from Mr. Carlson and from lack of options. The Berylsons ultimately realized that they had no real choice, as Sea-Dar was the only bidder left. If they had to re-bid the Project outside of the Boston and Massachusetts markets, there would be further extended delay in addition to the delays they had already experienced and identified herein.

119.    By that time, almost two years had passed since the Berylsons signed the Agreement with 1100.   They were reluctant to have a Contractor who was based outside of the Commonwealth of Massachusetts. The Berylsons always preferred to work with local

contractors. Local contractors can respond quickly and easily when issues arise, and the Berylsons anticipated the need for such quick turnaround and attention by their Contractor.

120.    After due deliberation, the Berylsons acknowledged that Sea-Dar was based in Boston, its principal, Jean Abouhamad, P.E., was a Columbia and Cornell educated and licensed Professional Engineer, and they rationalized Mr. Carlson's concerns as being based on years-old experiences.

121.    Based on the foregoing, and primarily relying on Piscuskas' and 1100's recommendation, architectural knowledge and expertise, as articulated to them through persuasive  conversations with Piscuskas and others at 1100, the Berylsons selected Sea-Dar as the Project's Contractor.

122.    Things began well on the Project with Sea-Dar.  The Berylsons and Mr. Carlson were even able to overcome the Plasterer, Mr. Van Gervin's, concerns, and sign him to work on the Project.

123.    Unfortunately, the Berylsons would be compelled to regret retaining Sea-Dar.

124.    Soon after the Berylsons retained Sea-Dar, Sea-Dar increased the projected Cost of the Work by thirty-five percent (35%). Specifically, Piscuskas, on behalf of 1100, informed the Berylsons that the Cost of the Work had increased to $16,100,000 based, in part, on Sea-Dar's inclusion of a 35% construction contingency in order to protect Sea-Dar for certain unknown conditions based on, in part, the incompleteness of 1100's Instruments of Service. This was despite the fact that the Berylsons had never discussed, or formally increased, their budget for the Project or ever given either 1100 or Piscuskas any indication permitting increases to that effect.

23

125.     This 35% increase was quite a shock to the Berylsons.  While they understood that a construction contingency should be anticipated for a large project involving both an older structure and a new structure combining modern materials over a period of years, the Berylsons understood that such a contingency should be no more than 10-15%.  Here they were facing an increase greater than 35% and construction had not even started.  Mr. Berylson refused to sign the proposed construction agreement with Sea-Dar.

126.     In an attempt to justify the drastic and sudden price escalation, Piscuskas conveyed to the Berylsons his assurances that there would be no further increases to the Cost of the Work for the Project.  Piscuskas did so to induce the Berylsons to further proceed at a Cost of the Work of $16,100,000, and the Berylsons believed and relied upon Piscuskas' assurance, as Mr. Berylson's friend, that there would be no further cost increases associated with Project.

127.     Reluctantly, and although they initially entered into the Agreement with 1100 under the pretense that the Project would cost between $10,575,000 and $12,740,000, the Berylsons were further induced, if not compelled, two years into the Project,  to proceed with the Project at a cost of $16,100,000. The Berylsons had spent millions of dollars on architectural fees and expenses, spent two years getting Town permits and approvals for Large House Review, Historical Commission approval, Demolition Review and approval, engaged a demolition contractor (F.H. Perry Builder (Hopkinton, MA) and had demolished and excavated the abutting building on 44 Highgate, and now their existing home was sitting beside a fenced-in hole in the ground, which their neighbors had stated was an eye-sore. Half of their existing home interior was walled off for construction, they were living in the other half and their daily lives were totally disrupted.

128.    The Berylsons and Sea-Dar entered a limited notice to proceed ("NTP") on July 27, 2018 which provided, among other things, that Sea Dar would be paid $1.5 million for certain work, labor and services, which was fully paid by the Berylsons.  A copy of the NTP is attached hereto as **Exhibit E.**

F.    **Sea-Dar Experienced Many Problems and Deficiencies, While the Cost of the Work Increased from $16.1 Million to $19 Million, and Sea-Dar was Eventually Terminated for Performance Breaches, Defective and Deficient Work Which Further Delayed the Project.**

129.    In the summer of 2018, almost exactly two years after the Agreement was executed, Sea-Dar finally began work at the Project.

130.    Almost immediately thereafter, it became apparent to both 1100 and the Berylsons that Sea-Dar was not a suitable or competent Contractor for the Project.

131.    Mr. Abouhamad's mother was ill over-seas in Lebanon and he was distracted and required to see to her needs, and was completely absent from the Project. Sea-Dar also assigned young and inexperienced project supervisors to the Project.  This combination of circumstances led to a series of failures by Sea-Dar to properly perform.

132.    Sea-Dar's most critical failure was its improper measuring and pouring of the foundation for the Berylsons' 44 Highgate addition.

133.    Sea-Dar's surveyor used incorrect marks which resulted in misplacement of structural walls and structural supports for the foundation. These miscalculations were off by as much as 6"-7", an error of tremendous magnitude for any project, but completely unacceptable given the precision required for the complex design and engineering of the Project. Like other work performed by Sea-Dar, 1100 and Piscuskas were required to verify the work in the field, in a real-time basis, in order to, among other things, mitigate adverse impacts of defective work on the Project that may arise later.

134.    Ultimately, Sea-Dar poured approximately 30 concrete structural supports or stress columns for the foundation, and several were found to be deficient and requiring replacement.  As noted above, 1100's drawings illustrated the locations of the foundation walls and structural supports.  1100's drawings specified that the location of these structures must be "VIF" or Verify-in-Field.  It was 1100's and Piscuskas' responsibility to do this critical supervision and verification, but they failed to identify the problems in time before needless and deficient work was completed.

135.    Further, Sea-Dar experienced multiple problems with deficient rebar work and the deficient placement of rebar in its concrete work.  Rebar is required to increase the tensile strength of the concrete and help it resist cracking and breaking over time. It was discovered that one of the intended stress columns that Sea-Dar installed was so deficient, it did not even touch the ground, leaving a gap between the foot of the column and the earth.

136.    Initially, 1100 missed all of this defective work, even though it was a contractual responsibility to review the performance of the construction.

137.    However, in due time, Piscuskas began complaining to Sea-Dar and Mr. Carlson about the quality and deficiencies in Sea-Dar's work.

138.    Piscuskas tried to keep these issues from the Berylsons. However, Mr. Abouhamad complained directly to the Berylsons that Piscuskas was deliberately undermining Sea-Dar, and that it was Piscuskas' and 1100's  fault for "drawing something that was impossible to build."

139.    This took the Berylsons by complete surprise, as neither Piscuskas nor Sea-Dar had ever suggested that the Project would be unusually difficult to complete or construct.

Piscuskas eventually told the Berylsons that he could not continue with Sea-Dar, and thought that Sea-Dar would need to be terminated.

140.    Sea-Dar's work on the Project culminated on December 10, 2018 when a Project meeting was called by 1100 and Sea-Dar ("December 10th Meeting"). The Berylsons, principals of Sea-Dar, and Piscuskas were to be in attendance.

141.    The day before the December 10th Meeting, Piscuskas called John Berylson by telephone.  He informed Mr. Berylson that Sea-Dar was going to make a disturbing announcement the next day: Sea-Dar was going to increase the Cost of the Work by approximately $3 million dollars.

142.    Mr. Berylson was adamant that this was not acceptable.

143.    Representatives of 1100 and Sea-Dar, as well as the Berylsons, attended the December 10th Meeting. Piscuskas participated in the December 10th Meeting by telephone.

144.    At the December 10th Meeting, 1100's representative informed the Berylsons, for the first time, and without any increase in their Project budget, that the Cost of the Work had again increased from $16,100,000 to more than $19,000,000.

145.    Sea-Dar claimed that when it issued its original bid, 1100's drawings were only 50-60% complete, and that as work began and progressed on the Project, and decisions were being made based on the previously incomplete drawings and consultations with 1100 and its consultants, the Cost of the Work had to increase.

146.    In fact, Sea-Dar advised 1100 and Piscuskas on numerous occasions that its estimates actually exceeded $20 Million, but 1100 and Piscuskas never informed the Berylsons of these facts.

147.    Inexplicably, Piscuskas failed to attend the December 10th Meeting in person. By doing so, Piscuskas refused to face the Berylsons and Sea-Dar at this crisis point despite his representations that he would be at the December 10th Meeting.

148.    Piscuskas, participating by telephone, remained eerily silent during the course of the December 10th Meeting and allowed 1100's representative, Robert Lipson, to explain the situation and justify the increase to the Cost of the Work.

149.    The Berylsons were furious and dismayed.

150.    After listening for some time, Mr. Berylson made clear to Mr. Lipson if any of his managers in business presented unanticipated cost-overruns of more than 35%, they would be terminated.  When Mr. Berylson demanded an explanation from Piscuskas given Sea-Dar's claims. Piscuskas said nothing and remained silent. The Berylsons ended the December 10th Meeting in disgust.

151.    The Construction Documents for the entirety of the Project were to be complete, pursuant to the terms of the Agreement, by mid-December 2017.  (Ex. C). However,  at the time of the December 10th Meeting, a year after the Construction Documents were to be completed, not only were they still not complete, but they were now alleged by Sea-Dar to be wholly inadequate to properly price the Project.

152.    As of the December 10th Meeting, measured from 1100's initial cost estimate, less than 2.5 years earlier, the Cost of the Work had increased by more than $7 million dollars or almost sixty percent (60%), despite the fact that 1100 had initially represented  to the Berylsons that the Cost of the Work would not exceed $12,740,000.

153.    Moreover, this additional price increase directly contradicted the prior representations made by 1100 and Piscuskas to the Berylsons in persuading them to agree to proceed with the Project and Sea-Dar at a cost of $16,100,000.

154.    Following the December 10th Meeting, the Berylsons discussed the situation with Mr. Carlson, who was nearing retirement, and their new Project Manager, Roberts.

155.    Over the last few months of Sea-Dar's work, Roberts had been gradually working on the Project with Mr. Carlson to make an effective transition to another contractor.

156.    The Berylsons also discussed the situation with Piscuskas, and it was agreed that the Berylsons had to terminate Sea-Dar due to its deficient work on the Project and it's nearly 35% cost increase demand.

157.    The Berylsons terminated the NTP in January 2019.

### G.   1100 Knew of the Increased Cost of the Work Prior to the December 10th Meeting and Failed to Advise the Berylsons.

158.    1100 maintained a series of documents for the Project which it obtained from Sea-Dar and shared with Berkshire and Roberts, which identified certain increases to the Cost of the Work that Sea-Dar had identified. However, Piscuskas never provided these documents to the Berylsons.

159.    These documents tended to show that 1100 had not, in fact, designed a $12 million Project. Rather, based on Sea-Dar's own account, 1100's design would result in a Cost of the Work far greater.

160.    1100 obtained a "Risk Expense Log" from Sea-Dar in July 2018[1], which showed three new Cost of the Work items that totaled $3.32 million increase in Sea-Dar's budget.  This

---

[1] The Risk Expense Log is misdated July 9, 2019. At that time, Sea Dar has been off the Project for six (6) months, so the correct date is July 9, 2018.

means that 1100 and Piscuskas knew in early July, 2018, that Sea-Dar's bid estimate of $16.1 million was actually $19.4 Million.

161.    This material change in the budget was not disclosed by 1100 or Piscuskas to the Berylsons until the night before the December 10th Meeting.  A true copy of the pertinent pages from the Risk Expense Log is attached hereto as **Exhibit F**.

162.    1100 and Piscuskas also obtained from Sea-Dar a "Financial Executive Summary" dated October 23, 2018, two months prior to the December 10th Meeting, which showed Project risk estimates valuing the Project at $21.5 million. Again, Piscuskas failed to disclose this important document to the Berylsons.  A true copy of the pertinent pages from the Financial Executive Summary is attached hereto as **Exhibit G.**

163.    1100 and Piscuskas next obtained a Sea-Dar "Summary" dated December 5, 2018, a mere five days before the December 10th Meeting, which showed the total Cost of the Work adjusted down slightly to $20.2 million.  This information was not disclosed to the Berylsons. A true copy of the pertinent pages from the Sea-Dar Summary is attached hereto as **Exhibit H.**

164.    Finally, 1100 and Piscuskas obtained an "Actual Risk Log" from Sea-Dar dated December 7, 2018 which listed approximately 35 price categories for various portions of the Project.  Eighteen of these categories provided "risk" values totaling approximately between $2 million-$3 million.  However, the other half, or seventeen categories, were listed as "TBD".

165.    Therefore, Sea-Dar and 1100 knew that half of the Actual Risk Log were completely unknown. To be sure, these amounts, once established, would further drive up the Cost of the Work.

166.     And for the third time, this information was not disclosed by 1100 or Piscuskas to the Berylsons.  A true copy of the pertinent pages from the Financial Executive Summary is attached as **Exhibit I.**

167.     In total, Sea-Dar ultimately estimated the Cost of the Work to be $25 million.

168.     In fact, Sea-Dar's principal, Mr. Abouhamad, told 1100 and Piscuskas that the Project as designed was "a $25 Million project all day long."  Piscuskas also told Roberts this same Sea-Dar statement many times.  This statement was not disclosed by 1100 or Piscuskas to the Berylsons.

169.     Roberts implored Piscuskas to share these documents and information with the Berylsons, but he never did.

170.     It was not the place of Berkshire or Roberts to go around 1100 or Piscuskas concerning such matters. Piscuskas prided himself on being the "Executive of the Project", and it was 1100's responsibility under the Agreement to keep the Berylsons informed about, among other things, Project costs.

171.     It was apparent that Piscuskas was afraid of the obvious implications of Sea-Dar's estimates which showed that Piscuskas never designed a Project costing, $12 million, $16.1 million or even $19 Million, and he did not want it shared with the Berylsons.

172.     Once Sea-Dar was terminated and 1100 had to find a replacement Contractor, Piscuskas found and had several discussions with the principal of the proposed replacement, Berkshire Wilton Partners, LLC ("Berkshire") (Darien, Connecticut), Paul Reiss, in an effort to sell him on accepting the Project, and even then, Piscuskas told Mr. Reiss that the Project was a $14-$16 million project.  This was a total misrepresentation in light of the foregoing information accumulated over many months by 1100 and Piscuskas from Sea-Dar.

iManageDB1\109089\000005\3676412.v3-3/25/21

**H.  After Sea Dar's Termination a Contractor Had to Be Engaged Resulting in Further Delay to the Project.**

173.    The decision to terminate Sea-Dar was not made lightly. In sum, terminating Sea-Dar posed significant issues for the Berylsons.

174.    First, the Berylsons had to quickly find a highly qualified general contractor to replace Sea-Dar, in circumstances where that general contractor would have to move very quickly to get up to speed, line up its own sub-contractors, and inherit, and be forced to rectify, serious deficiencies before its own work could proceed.

175.    Second, at the time of termination, Sea-Dar and its sub-contractors were owed approximately $274,000.  However, the Berylsons refused to pay Sea-Dar, because the cost to repair Sea-Dar's deficiencies was estimated to be more than the alleged balance due Sea-Dar.

176.    Accordingly, from January to June, 2019, all work on the Project was halted. This work stoppage, necessary because the Berylsons did not want to modify Sea-Dar's defective work in the face of spoliation claims by Sea-Dar, constituted further delays to the Project. The Berylsons wanted to allow for forensic investigation and evidence preservation of all the Sea-Dar deficiencies in the event of anticipated litigation.

177.    Ultimately, Piscuskas recommended Berkshire (Darien, Connecticut) who had capacity and requisite expertise to work on the Project.

178.    Paul Reiss, is Yale educated with a Bachelor's Degree in economics and a Master's Degree in Architecture.  He also has an MBA from New York University, and over twenty-four years of construction experience.

179.    The Berylsons had to make a quick determination to try to avoid further delays to the Project.

iManageDB1\109089\000005\3676412.v3-3/25/21

180.     The Berylsons accepted 1100's and Piscuskas' recommendation and engaged Berkshire on February 7, 2019.

181.     Once Berkshire came on board, it required many months to get Berkshire's administration, time and materials estimates and sub-contractor pricing in order for the Project.

182.     During the 7-8 month work stoppage for forensic investigation and evidence preservation, Berkshire began certain administrative and mobilization work on the Project.

183.     At the same time, two forensic surveyors verified the incorrect marks and survey errors of Sea-Dar's surveyor.  Sea-Dar had a third surveyor verify these results.  Eventually, John Kruse, Vice President of Sea-Dar, inspected the site and verified the survey errors, but disputed the other deficiencies and insisted on substantial payment from the Berylsons.

184.     The Berylsons refused to pay Sea-Dar, but with Roberts' assistance, they were later able to voluntarily and directly pay some of Sea-Dar's sub-contractors who were not to blame. In tacit recognition of its responsibility for the deficient work and project delay, Sea-Dar never sued the Berylsons for its payment claim.

185.     Once the Sea Dar investigation and evidence preservation period was complete, Berkshire began to plan and implement its work to address the Sea-Dar deficiencies.  This would take several months to complete. Because work had essentially halted on the Project once the surveying errors and concrete structural supports, stress columns and rebar issues had been discovered in the early winter of 2019, it was approximately three-quarters of a year that the Project was delayed before new construction could resume at a total administrative and remediation cost of at least $1.5 million dollars.

I.    **The Berylsons Dispute 1100's Assertion That the Agreement Expired, and Reject 1100's Additional Services Billings Due To 1100's Breaches of the Agreement.**

186.    1100's delays in its own architectural services, the on-going incompletion of its design and construction drawings, delays incurred at the inception of the Project during the zoning process, together with delays incurred at the hands of its recommended general contractor, Sea-Dar, have combined to cause a delay, conservatively, of over two (2) years on the Project.

187.    1100 and Piscuskas deny responsibility for Sea-Dar's errors and deficient work and the other delays on the Project.

188.    However, due to their representation that Sea-Dar possessed the qualifications, skill and expertise to competently proceed as the Project's Contractor, and their recommendation to the Berylsons to retain Sea-Dar, when 1100 and Piscuskas knew that Sea-Dar was not qualified to do so, 1100 and Piscuskas cannot justly claim that they take no responsibility, or no fault, for the harm Sea-Dar caused the Berylsons.

189.    Further, there is no doubt that 1100 and Piscuskas were the sole actors in obtaining zoning approval, something it failed to do for 1.5 years after signing the Agreement.

190.    Finally, as shown above, 1100 was slow in preparing the drawings for the Project, a deficiency that exists today, almost 5 years later.

191.    In sum, 1100 and Piscuskas cannot justly claim that the Agreement expired after only 39 months, as 1100 simply cannot claim zero fault or responsibility for any of these delay events for which it is directly, or at the very least, jointly responsible.

192.    For the same reasons, 1100 cannot claim a right to bill the Berylsons for Additional Services after just 39 months from the date of the Agreement.

iManageDB1\109089\000005\3676412.v3-3/25/21

193.     1100's misconduct in this regard is not only in breach of the Agreement, but a bad faith act intended to deprive the Berylsons of the benefit of their full percentage payments on the Project, and their percentage-payment bargain under the Agreement.

194.     Not only was 1100 not entitled to bill the Berylsons for Additional Services due to it being at fault for not completing its services owed under the Agreement by October 6, 2019 and for other delays it caused, the Agreement required 1100, if it determined that "any" Additional Services were required, (i) to provide notice to the Berylsons of its best estimate of the cost of such Additional Services and a description and scope of such Additional Services, and (ii) obtain the Berylsons' prior written approval to perform same.  (Ex. B, Art. 4, § 4.1).

195.     Under the Agreement, failure on the part of 1100 to so notify and obtain written approval of the Berylsons prior to commencing with such Additional Services would constitute an irrevocable and conclusive waiver of any claim for additional compensation on account of such Additional Services. (Ex. B, Art. 4, § 4.1)

196.     Indeed, 1100 acknowledged that it was not entitled to bill the Project on an hourly rate basis on and after October 6, 2019, by its submission of percentage-fee invoices in November 2019, December 2019, January 2020, February 2020 and March 2020. For these invoices, 1100 continued to bill the Berylsons the agreed upon fee based on a percentage of the Cost of the Work.

197.     Thereafter, the next invoice 1100 submitted to the Berylsons was not until September 2020 in the amount of $707,367.25, for alleged services performed by 1100 as Additional Services, or on an hourly-rate basis.

198.     1100 failed to provide notice to the Berylsons that it intended to seek compensation for Additional Services and failed to obtain the Berylsons' written approval to incur such Additional Services.

199.     Under the Agreement, by not complying with the strict notice and approval requirements of the Agreement in connection with Additional Services, 1100 breached the Agreement and waived, irrevocably and conclusively, any claim for additional compensation on account of such alleged Additional Services.

**J.      1100 Failed to Manage the Cost of the Work, and Now Claims the Cost of the Work is Over $28 Million, Inclusive of the Total Cost of All Sea-Dar's Work, Including Its Deficient Work.**

200.     Following Sea-Dar's removal, it became clear that 1100 had no financial incentive, nor professional desire to, limit the Cost of the Work for the Project.

201.     To the contrary, as the Cost of the Work continued to increase, 1100's corresponding fee also increased.

202.     From almost the very beginning of 1100's involvement on the Project, the Cost of the Work ballooned, and as the Cost of the Work increased, so too did 1100's Fee.

203.     As noted herein, 1100 initially estimated the Cost of the Work to be $10,575,000 to $12,740,000.

204.     In fact, by its own billing, in August 2016, two months after executing the Agreement, 1100 represented that the estimated Cost of the Work was $11,500,000. A true copy of 1100's August 2016 Invoice is attached hereto as **Exhibit J**.

205.     Upon information and belief, this estimate was entirely too low. For a project of this size, scope and complexity, the Cost of the Work should have been estimated at millions of dollars more. This is supported by Sea-Dar's and Berkshire's own estimates.

36

206.    1100, an experienced architect selected, in part, for its ability to estimate costs, knew that the estimate provided, and upon which the Berylsons detrimentally relied, was inadequate to capture the true costs of the Project.

207.    It is no wonder then, that the $11,500,000 Cost of the Work soon, and very rapidly, increased.

208.    In August 2017, almost a year after signing the Agreement, 1100 represented that the estimated Cost of the Work increased $1 million to $12,500,000. A true copy of 1100's August 2017 Invoice is attached hereto as **Exhibit K**.

209.    Three months later, in November 2017, 1100 represented that the estimated Cost of the Work was $14 million, a $1.5 million increase in three months. A true copy 1100's November 2017 Invoice is attached hereto as **Exhibit L**.

210.     Then, in March 2018, a mere four months later, the estimated Cost of the Work skyrocketed by $2 million. Less than two years after signing the Agreement, the Cost of the Work increased by $4.5 million to $16 million. A true copy of 1100's March 2018 Invoice is attached hereto as **Exhibit M**.

211.    In November 2018, the estimated Cost of the Work was $17 million. A true copy of 1100's November 2018 Invoice is attached hereto as **Exhibit N.**

212.    In June 2019, the estimated Cost of the Work was $19 million, only to be increased by $2 million over the next three months, so that in September 2019, the estimated Cost of the Work was $21 million. True copies of 1100's June and September 2019 Invoices are attached hereto as **Exhibit O**.

213.    The $21 million estimated Cost of the Work remained static until January 2020.

iManageDB1\109089\000005\3676412.v3-3/25/21

214.    Based on its January 31, 2020 Payment Requisition, Berkshire estimated the Cost of the Work to be $27,291,000.

215.    Beginning in April 2020, 1100 discontinued submitting invoices to the Berylsons. By that time, the Cost of the Work ballooned to more than $28 million.

216.    As 1100's Fee and the Cost of the Work increased, Piscuskas' involvement in the Project decreased. Despite being a "key employee" under the Agreement, which required devotion to the Project, Piscuskas withdrew. For much of 2020, Piscuskas was nowhere to be seen.

217.    Despite the foregoing, and the ever increasing 1100 Fee, the Berylsons had continued to pay 1100 through January, 2020.

218.    Through January 2020, the Berylsons paid every invoice submitted by 1100, totaling approximately $4,000,000.

219.    Moreover, despite the ever increasing Cost of the Work, there was no clear justification for such increases. At no time during this time period, did the Project foot print or square footage increase.

220.    At no time did the Berylsons agree to changes in the construction, materials or fixtures

221.    More critically, at no time did 1100 or Piscuskas, advise the Berylsons of the increases in the Cost of the Work or of the reasons for the increases.

222.    Most recently, in February, 2021, just before 1100 unilaterally terminated the parties' Agreement in March, 2021, another 1100 representative and principal architect of 1100 working on the Project, Ed Parker, told Roberts that the Project was now a $25 million Project, confirming what Mr. Abouhamad and Piscuskas had said privately, but never to the Berylsons.

223. Based on the foregoing, a Project that the Berylsons thought at the time they signed the Agreement, and based on 1100's and Piscuskas' representations, would cost, at most, just over $12 million, is now, less than five years later, to cost over $28 million. A $16 million increase, representing a 133% increase, for the renovation of an existing home and the construction of an addition to same, and all with 1100 and Piscuskas at the helm.

**K.** **In spite of All the Project Delays Attributable to 1100, 1100 Declared the Agreement Expired, and Began Billing the Berylsons for Additional Services Beginning in November, 2019.**

224. Even though the ever increasing Cost of the Work directly benefited 1100 and Piscuskas over the life of the Agreement, 1100 unilaterally deemed the Agreement expired in October 2019, which enabled 1100 to bill the Berylsons on an hourly-rate basis. An even more lucrative payment arrangement for 1100.

225. Despite being paid millions of dollars on the Project, it became apparent to 1100 and Piscuskas that achieving the Project requirements, including those imposed by the Berylsons, would ultimately lose 1100 money.

226. Upon information and belief, Piscuskas concluded that a fee based on a percentage of a Cost of the Work which is ultimately capped, would not equitably compensate 1100 for the services for a Project that was increasingly becoming more complicated and more demanding.

227. 1100 and Piscuskas needed a way to deviate from the agreed upon payment terms.

228. Realizing that the 39 month term of the Agreement was approaching, and notwithstanding more than two years of various delays caused, at least in part, by delays arising from 1100's and Piscuskas' acts and omissions, 1100 and Piscuskas identified the perfect justification to try and squeeze even more fee revenue out of the Berylsons.

229.     Therefore, 1100 and Piscuskas, without notice or approval, unilaterally converted its billing under the Agreement to an hourly-rate basis starting in November 2019.

230.     And, in order to preserve this new hourly-rate scheme and shield it from the Berylsons, 1100 failed to submit an invoice for five months while it accrued hourly-rate charges.

231.     The Agreement required that invoices be submitted monthly.  (Ex. B, Art. 11, § 11.9.2).

232.     In March 2020, 1100 submitted its last invoice based on its 18.5% percentage-fee arrangement.

233.     It was only in September 2020 that the Berylsons realized the true depth of 1100's nefarious scheme.

234.     In September 2020, 1100 finally submitted over one hundred pages in hourly-rate charges, totaling more than $700,000, covering services allegedly performed from November 2019 to August 2020.

235.     1100's unjustifiable decision to convert the Agreement to an hourly-rate basis, was belied by the fact that for the months of November 2019 to March 2020, 1100 billed the Project on the agreed upon percentage-fee arrangement.

236.     It was not simply to hide the hourly charges from the Berylsons that motivated 1100 to not submit an invoice for five months. 1100 and Piscuskas had an ulterior motive for recording and driving up the hourly fees without notice to the Berylson: 1100 and Piscuskas wanted to contrive a payment dispute that would trigger the expedited fee dispute provision in the Agreement.

**L.**     **1100 Improperly Attempted to Commence Expedited AAA Fee Arbitration Under the Agreement, Which was Inapplicable to the Parties' Dispute and Otherwise Premature.**

237.    There is no doubt the Agreement allowed the Berylsons to dispute 1100's services and rightly refuse to pay for same. (Ex. B, Art. 9, § 9.1).

238.    The parties agreed, however, that for certain fee disputes exceeding a certain threshold amount, such a narrow type of disputes would be submitted to expedited arbitration. (Ex. B, Art. 8, § 8.1.4).

239.    By failing to submit invoices for five months, and thereby accruing and increasing the fees without notice to the Berylsons, 1100 artificially increased the fee amount in dispute, thereby reaching the fee arbitration threshold and allegedly bringing the dispute under the auspices of Section 8.1.4.

240.    The failure to submit invoices also denied the Berylsons' their express right to dispute 1100's claims for payment. With no invoice, there can be no corresponding review and potential dispute by the Berylsons.

241.    More critically, by not submitting invoices for five months, the Berylsons' obligation to pay 1100 was never triggered.

242.    The Agreement provides that payment to 1100 shall be made within 30 days of receipt of an invoice. (Ex. B, Art. 11, § 11.9.3).

243.    Further, 1100's submission of *one* invoice covering 10 months of services was another breach of the Agreement.

244.    1100's actions – converting the payment arrangement to hourly-rate billing and failing to submit monthly invoices to the Berylsons – left the Berylsons no choice, but to dispute the demand for payment by 1100. And that was the object.

245.    1100 engineered a large fee dispute and then sought to force the Berylsons to adjudicate this dispute in an arbitration setting, as opposed to submission of such claim, and their many other claims set out in this action to mutually agreed-upon litigation forum.

**M.    Arbitration is Not the Proper Venue for this Dispute.**

246.    As a result of the forgoing, the Berylsons have refused to pay 1100's hourly billing invoices because the Berylsons maintain that the Agreement has not expired due to the delays attributable either all, or in part, to 1100, and therefore, all of 1100's hourly billing invoices are a nullity, and the Project should only be billed on a percentage-fee basis for Basic Services.

247.    The Berylsons also maintain that they were fraudulently induced to enter into the Agreement relying on 1100's claim that the Cost of the Work would be $12 million, an amount that 1100 and Piscuskas knew to be utterly false and deficient.

248.    The Berylsons' reliance on 1100 was misplaced, something they learned when they discovered that the only allegedly qualified bidder, Sea-Dar, wholly underbid the Project. A fact that 1100 and Piscuskas knew when it received the bid and during the latter part of 2018.

249.    Pursuant to Article 8, Section 8.2 of the Agreement entitled "Mediation," the parties agreed at Section 8.2.1, *"[a]ny* claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to binding dispute resolution." (Emphasis added). (Ex. B, Art. 8, §8.2.1).

250.    Pursuant to Section 8.2.4, the parties agreed, "[i]f the parties do not resolve a dispute through mediation . . . the method of binding dispute resolution shall be the following: [X] Litigation in a court of competent jurisdiction.  (Ex. B, Art. 8, §8.2.4) (the Agreement form also provides for arbitration as an option to resolve all disputes pursuant to Section 8.3, but the parties mutually declined arbitration as the forum for binding dispute resolution).

251.    In direct violation of the parties' Agreement, 1100 filed a Demand for Expedited

Fee Arbitration before the American Arbitration Association ("AAA") on February 17, 2021.  A

true copy of the Demand for Arbitration and correspondence from the AAA docketing and

providing notice of pre-arbitration procedure is attached hereto as **Exhibit P**.

252.    Notwithstanding the forgoing provisions of the Agreement, and the absolute

requirement for mediation as a condition precedent to any binding dispute resolution, 1100 and

its counsel asserted that they could invoke Section 8.1.4 and Section 7.2, in commencing

expedited fee arbitration.

253.    Simultaneous with its service of the Demand for Arbitration, 1100 also served a

notice of its intent to suspend its services in seven days effective February 24, 2021, and

terminate the Agreement in fifteen days, which 1100 did on March 4, 2021.  A true copy of the

Notice of Suspension and Notice of Termination are each attached hereto as **Exhibit Q.**

254.    A key feature of Section 8.1.4 and Section 7.2, and the only reason the parties

agreed to an expedited fee dispute arbitration, is that they require 1100 to continue to perform its

services while any fee arbitration remains on-going.

255.    By terminating the Agreement, 1100 will not continue its services as intended,

even if an arbitration were to take place. Accordingly, the provisions' goal of maintaining Project

continuity during fee arbitration will no longer be achievable. As such, the fee arbitration

mechanism is no longer viable or applicable.

256.    Based on the foregoing, the parties' counsel exchanged competing

correspondence with the AAA asserting that the AAA had no jurisdiction over the issues and

disputes in this case. Such correspondence shall be referred to collectively as the "Arbitration

Communications".  A true copy of the Arbitration Communications in chronological order are attached hereto as **Exhibit R**.

257.    On March 11, 2021, the AAA preliminarily ruled in electronic mail correspondence that the AAA would commence the arbitration which 1100 demanded notwithstanding the objections raised by the Berylsons. A true copy of the electronic mail correspondence from the AAA is attached hereto as **Exhibit S**.   However, in so ruling, the AAA specifically stated that the Arbitration Communications would be available to the Arbitrator, so that the Arbitrator could make substantive rulings on proper jurisdiction. The AAA also invited the parties to seek appropriate relief in a court of law.  It is the law of the Commonwealth of Massachusetts and Federal law in Agreements of this nature, that the Court determines the substantive arbitrability of issues.

258.    The AAA's administrative decision to docket and proceed with the Arbitration was improper. The AAA exceeded its authority in the face of the Sections 8.2.1 and Section 8.2.4 of the Agreement, and the applicable Massachusetts and Federal law.

259.    This is especially true in circumstances where 1100 has unilaterally terminated the Agreement, and the very narrow purpose and right for 1100 to pursue alleged fee non-payment issues (i.e. so as not to disrupt the Project), was completely mooted by 1100's termination of the Agreement.

260.    The arbitration allowed by Sections 8.1.4 and 7.2 of the Agreement, was limited in scope and does not extend to the adjudication of the claims presented by the Berylsons herein, such as breach of contract, bad faith, fraud and M.G.L. c. 93A claims.

261.    The Berylsons' factual claims made herein, and the causes of action which they support, challenge and dispute the very existence and legitimacy of 1100's hourly billings in the

first place, which the parties agreed must be resolved by litigation in a court of competent jurisdiction.  (Ex. B, Art. 8, §§ 8.2.1 and 8.2.4).

262.    The expedited nature of the fee arbitration contemplated by the Agreement, was not intended to cover such substantive common law and statutory legal claims, wholly apart from resolution of minor non-payment claims so that the architect would otherwise continue its services and the Project continue unabated.

263.    On March 15, 2021, 1100, Piscuskas and their attorney improperly issued a Notice of Termination/Withdrawal of Services and Instruments of Service Regarding 38 + 44 Highgate, Wellesley, Massachusetts to Roberts, Berkshire, the Berylsons' subcontractors, Berkshire's sub-contractors and sub-subcontractors, consultants, engineers or other "Project Participants" ("Participant Notice").  A true copy of the Participant Notice is attached as **Exhibit T.**

264.    The Participant Notice was issued to parties who have no contractual affiliation with 1100, Piscuskas or their attorney in connection with the Project.  The Participant Notice was intended to delay, disrupt or stop work on the Project, and to disturb, intimidate and harass the Project Participants and interfere with their various relationships with the Berylsons, Roberts, and Berkshire.

265.    1100 has paid the fee to AAA for the expedited fee arbitration.  The AAA issued a demand on March 19, 2021, requiring that the Parties signify by March 22, 2021, specified dates within the next two weeks for an Administrative Conference call.   A true copy of the AAA Conference call demand is attached as **Exhibit U.**

266.    The Berylsons, coextensive with the filing of this Complaint, have filed an Emergency Motion to Stay Arbitration and a Compel Mediation prior to this Litigation as

authorized pursuant to the Agreement. The Court should grant the Berylsons' Motion to Stay the AAA arbitration in keeping with the parties' Agreement, and further because 1100 unilaterally terminated the Agreement.  The Court should compel the parties to Mediation as the required condition precedent to binding dispute resolution by litigation in this Court.

N.    **The Berylsons Have Suffered Damages due to the Actions of 1100 and Piscuskas and Will Suffer Irreparable Harm Unless Equitable Relief is Granted.**

267.    Upon information and belief, 1100, through Piscuskas, provided the Berylsons with a purposefully unrealistic expected construction cost between $10,575,000 to $12,740,000, to fraudulently induce them into entering into the Agreement, when Piscuskas and 1100 knew that routine market pricing based on square footage and average cost per square foot estimates given the quality, design and finish specified on the Project, and market factors as they existed in April of 2016, compelled  a significantly higher projected Cost of the Work well in excess of $20 million dollars.

268.    Since 1100 provided the Berylsons with an initial projected Cost of the Work that was neither realistic, nor feasible to achieve, the actual cost of the Project has increased to a cost over $28,000,000, to the significant financial benefit of 1100 and Piscuskas over a period of several years, and to the detriment of the Berylsons.

269.    1100's and Piscuskas' statements, conduct, acts, and omissions, as detailed above, constitute breaches of the Agreement, bad faith, fraud and deceit at Paragraphs Nos.: 28, 30-32, 36-40, 41-42, 44-46, 47-48,  49-52, 52-54, 55-57, 58-60, 61-71, 72-100, 101-127, 129-157, 158-171, 172-185, 186-191, 192-199, 200-215, 216-223, 224-236, 237-245, and 246-265.

270.    Since that time, the Berylsons have been forced to hire other professionals to rectify, re-design and reconstruct work completed either at the direction or under the supervision of 1100 at the Project.

271.    To date, the Berylsons have expended significant sums of money to remediate and repair work improperly completed by others under the supervision or 1100 or ordered to be completed by 1100 at the Project.

272.    To date, the Berylsons have incurred legal costs in seeking 1100's proper and continuing performance under the Agreement.

273.    The Berylsons have suffered irreparable harm.  They continue to lose the full use and enjoyment of their home  due to delay and the incomplete construction for the Project, and without architectural and/or general contractor guidance and supervision during this complex phased construction project, believe it will soon become uninhabitable when further construction and renovation is undertaken without access to the Instruments of Service necessary to complete the work; all due to the actions of 1100 and Piscuskas, even though they have more than paid for the Instruments of Service as they stand in full.

274.    The Berylsons also face the potential loss of highly-skilled and in-demand A-list contractors, sub-contractors, consultants and engineers, who could pull out and seek new work if the project is delayed.  Because of their unique skill and abilities which brought them to the Project, some of these tradesman and craftsman are in high-demand and simply cannot be replaced by others of like skill, quality and experience.

275.    According to Roberts and Reiss, the Berylsons are still facing at least two to two and a half years of on-going construction provided the Project continues as scheduled.  Any further delay will be devastating to them.

276.    Most recently, the Berylsons have suffered damages due to the 1100's suspect business practices. 1100 and Piscuskas have failed to fully cooperate and provide access to the Berylsons' Auditors, Deloitte Transactions and Business Analytics, LLP, all the material

information for the Auditors to conduct the Audit which the Berylsons have demanded in accord with their rights under the Agreement.

277.    Upon information and belief, 1100 has charged for services performed at the Project that was not authorized or approved by the Berylsons

278.    Upon information and belief, 1100 has sought reimbursement for costs from the Berylsons for expenses that were unrelated to the Project.

279.    Upon information and belief, 1100 has potentially excessively or "double-billed" the Berylsons for services performed at the Project.

280.    Upon information and belief, 1100 has billed the Berylsons for their legal costs associated with disputes between the parties.

## CAUSES OF ACTION

### Count I - Declaratory Relief

### (Against All Defendants)

281.    The Berylsons incorporate by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

282.    This Count is brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201.

283.    An actual controversy exists between the parties as to:

    i.    Whether 1100 was able to lawfully terminate the Agreement for cause in the circumstances of this case pursuant to Section 9.1 of the Parties' Agreement;

    ii.    Whether 1100 rightfully terminated the Agreement for cause pursuant to Section 9.1 of the Parties' Agreement;

iii.     Whether the Berylsons nonexclusive, perpetual, irrevocable license to use the Instruments of Service can be lawfully terminated by 1100 in the circumstances of this case pursuant to Section 7.2 of the Parties' Agreement;

iv.     Whether the Parties' Agreement requires that this dispute be first mediated and then litigated, and is not subject to expedited Fee Arbitration; and

v.     Whether the expedited Fee Arbitration provision in the Parties' Agreement does not apply to invoices that are entirely disputed as illegitimate in the first instance.

WHEREFORE, a declaratory judgment should enter in favor of the Berylsons and against the Defendants on each of these disputed issues.

## Count II - Breach of Contract
### (Against 1100)

284.     The Berylsons incorporate by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

285.     The Berylsons' contracted with 1100 pursuant to the Agreement for Architectural services on the Project.

286.     1100 breached the parties' Agreement as alleged above.

287.     As a direct and proximate result of the breaches by 1100, the Berylsons have suffered damages.

WHEREFORE, the Berylsons request that this Honorable Court enter judgment against 1100 for monetary damages for which 1100 is liable in an amount to be proven at trial, plus interest, contractual attorney's fees, and court costs.

## COUNT III – Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against 1100)

288.     The Berylsons incorporate by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

289.     Inherent in every contract is an implied covenant of good faith and fair dealing which required 1100 to treat the Berylsons fairly and in good faith.

290.     As set forth in detail above, 1100 violated the covenant of good faith and fair dealing by failing to properly perform the contract in good faith, engaging in multiple acts of bad faith and deception, including deeming the contract expired prematurely so 1100 could attempt to bill hourly for its services.

291.     1100 is trying to deny the Berylsons the benefit of their bargain for work on the Project.

292.     As a direct and proximate result of 1100's breach of the implied covenant of good faith and fair dealing, the Berylsons have incurred substantial monetary damages.

WHEREFORE, the Berylsons request that this Honorable Court enter judgment against 1100 for monetary damages for which 1100 is liable in an amount to be proven at trial, plus interest, contractual attorney's fees, and court costs.

### Count IV – Fraud In The Inducement
### (Against All Defendants)

293.     The Berylsons repeat and incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth here in their entirety.

294.     1100 and Piscuskas represented and promised the Project would cost between $10,575,000 and $12,740,000.

295.     The Berylsons reasonably relied on 1100's and Piscuskas' material statements as to the anticipated cost of the Project which 1100 and Piscuskas designed, to their detriment.

50

296.    1100 and Piscuskas knew that the Berylsons would rely on their cost estimates for the Project in determining whether to undertake the Project and enter the Agreement.

297.    1100 and Piscuskas knowingly under-represented the estimated costs of the Project to induce the Berylsons to undertake the Project and enter the Agreement.

298.    The actual cost of the Project is now estimated to exceed $28 Million dollars, including costs of delay, administrative costs and remediation costs for Sea Dar's deficient work and the replacement of Sea Dar as general contractor.

299.    The Berylsons incurred at least $15,260,000 in damages as a result of 1100's and Piscuskas' fraudulent and misleading statements and inducements.

WHEREFORE, the Berylsons request that this Honorable Court enter judgment against 1100 and Piscuskas for monetary damages for fraud in the inducement in the amount of at least $15,260,000, or for the exact amount for which they are liable in an amount to be proven at trial, plus interest, contractual attorney's fees, and court costs.

### Count V – Fraud
### (Against All Defendants)

300.    The Berylsons repeat and incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth here in their entirety.

301.    1100 and Piscuskas represented and promised that the Project would not exceed $16.1 Million in Cost of Work.

302.    The Berylsons reasonably relied on 1100's and Piscuskas' material statements as to the $16.1 Million in Cost of Work, to their detriment when they learned that the Cost of Work will likely exceed $28 Million, including costs of delay, administrative costs and remediation costs for Sea Dar's deficient work and the replacement of Sea Dar as general contractor.

51

303.    1100 and Piscuskas knew that the Berylsons would rely on their representations and assurances that the cost of Work would not exceed $16.1 Million.

304.    1100 and Piscuskas knowingly under-represented the Cost of Work of the Project to induce the Berylsons to continue the Project.

305.    The actual cost of the Project is now estimated to exceed $28 Million dollars, including costs of delay, administrative costs and remediation costs for Sea Dar's deficient work and the replacement of Sea Dar as general contractor.

306.    The Berylsons incurred at least $11,900,000 in damages as a result of 1100's and Piscuskas' fraudulent and misleading statements and inducements.

WHEREFORE, the Berylsons request that this Honorable Court enter judgment against 1100 and Piscuskas for monetary damages for fraud in the amount of at least $11, 900,000, or for the exact amount which they are liable in an amount to be proven at trial, plus interest, contractual attorney's fees, and court costs.

### Count VI - Violations of G.L. c. 93A, § 11
### (Against All Defendants)

307.    The Berylsons incorporate by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

308.    Massachusetts General Laws Chapter 93A, §§ 2 and 9 prohibit the use or employment of unfair or deceptive acts or practices in the conduct of trade or commerce with consumers like the Berylsons.

309.    The Defendants engaged in the conduct of trade or commerce within the Commonwealth of Massachusetts including, inter alia, their regular communications with the Berylsons by letter, email and telephone and their transacting of business with the Berylsons on the Project in Massachusetts.

310.    The Defendants multiple acts of bad faith and their perpetration of fraud as alleged in this Complaint, constitute unfair or deceptive acts or practices.

311.    The harm suffered by the Berylsons occurred in Massachusetts.

312.    Pursuant to G.L. c. 93A §§ 2 and 9, the Defendants have engaged in unfair and deceptive acts or practices as described herein including, inter alia, by; denying the Berylsons the good faith benefit of their bargain pursuant to the Agreement and for fraud in the inducement to contract and fraud in performance of the contract in connection with the estimated Project Cost, or the Cost of Work for the Project.

313.    The Berylsons have suffered the loss of money or property as a result of the Defendants' unfair and deceptive acts or practices.

314.    The Defendants' violations of G.L. c. 93A, were willful and knowing, entitling the Berylsons to double or treble damages their actual damages and their attorneys' fees and costs.

WHEREFORE, the Berylsons request that this Honorable Court enter judgment against 1100 and Piscuskas for actual damages, plus double or treble their actual damages, for which they are liable in an amount to be proven at trial, plus interest, statutory attorney's fees, and court costs

## Count VII– Injunctive Relief
### (Against All Defendants)

315.    The Berylsons incorporate by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

316.    The Berylsons will be irreparably harmed if: (i) the expedited fee arbitration were to move forward and not be stayed for lack of substantive arbitrability,  the risk of inconsistent results, and the lack of full discovery and use of the rules of evidence; (ii) 1100 and/or Piscuskas

seek to deny the Berylsons, their Contractor, project manager, subcontractors, consultants, engineers and all other Project personnel, the ability to continue their contractual license for day-to-day access to the Instruments of Service (drawings, architectural plans and specifications for the Project) which the Defendants created specifically and specially for the Project, and for which the Berylsons have already paid in full, as the Project is on-going both inside and adjacent to the home which they currently occupy, and this includes continuing maintenance with the Town of any permits,  special permits or controlled construction documents which 1100 and/or Piscuskas obtained from the Town for the Project; (iii) the Berylsons continue to lose the full use and enjoyment of their home due to delay and the incomplete construction for the Project and face the risk of losing irreplaceable A-list contractor, sub-contractors, consultants and engineers if the Project is delayed; (iv) 1100 or Piscuskas continue to intimidate Project Participants to cause delay, disruption or work-stoppage on the Project, and/or to disturb, intimidate and harass the Project Participants and interfere with their various relationships with the Berylsons, Roberts, and Berkshire.

317.    The Berylsons have no adequate remedy at law if day-to-day access to the Instruments of Service (drawings, architectural plans and specifications for the Project) and continuing maintenance with the Town of any permits, r special permits or controlled construction documents which 1100 and/or Piscuskas obtained from the Town for the Project is ever stopped, interrupted or delayed, as any corresponding delays may cause them to lose their highly specialized,  skilled A-list general contractor, subcontractors, consultants, engineers and all other Project personnel, required for a Project of this scale and architectural complexity.

318.    A balancing of the equities favors maintaining the status quo concerning day-to-day access to the Instruments of Service (drawings, architectural plans and specifications for the

Project) and continuing maintenance with the Town of any permits, special permits or controlled construction documents which 1100 and/or Piscuskas obtained from the Town for the Project, as the Defendants have been paid for the drawings and permits.

319.    The public interest will be served by granting an injunction in this case as the Berylsons' neighbors in the Town shall be unfairly disrupted if construction on this project, which has already been substantially delayed as outlined above, is further delayed.

WHEREFORE, the Berylsons request that this Honorable Court grant their application for a temporary restraining order and then injunctive relief and enjoin the Defendants from: 1) terminating or interfering in any way with the non-exclusive, perpetual, irrevocable license to use 1100's Instruments of Service, or the Berylsons' authorized Contractor, subcontractors, sub-subcontractors, to reproduce applicable portions of the Instruments of Service solely for use in performing services and construction of the Project pending a determination of the Court whether 1100's termination of the Agreement for cause was rightful under the Agreement; 2) terminating, withdrawing or interfering in any way with the architectural control certification and licensure documents, Instruments of Service, applications or other documents provided to the Town in order to secure required approvals, special permits or permits for controlled construction work on the Project pending a determination of the Court whether 1100's termination of the Agreement for cause was both lawful and rightful under the Agreement; 3) communicating in any way with the Berylsons, Berkshire or the Berylsons' or Berkshire's subcontractors, sub-subcontractors, consultants, engineers or other tradesman or professionals working on the Project in any manner at any time; 4) failing to provide necessary certifications or sign-offs required by the Town regarding supervision and control over the Project from July 6, 2016 through March 4, 2021 or beyond as the Court so determines under Count I; and 5) failing

to fully cooperate and provide the Berylsons' auditors with complete access to certain of 1100's business and billing records in connection with the Project as required for an audit authorized by the Agreement.

## DEMANDS FOR RELIEF

WHEREFORE, the Plaintiffs, John G. Berylson and Amy Smith Berylson, demand the following relief:

A.    The Court enter a judgment declaring, determining and adjudging on Count I that:

  i.    1100 was not able to lawfully terminate the Agreement for cause in the circumstances of this case pursuant to Section 9.1 of the Parties' Agreement;

  ii.    1100 did not rightfully terminate the Agreement for cause pursuant to Section 9.1 of the Parties' Agreement;

  iii.    The Berylsons nonexclusive, perpetual, irrevocable license to use the Instruments of Service cannot be lawfully terminated by 1100 in the circumstances of this pursuant to Section 7.2 of the Parties' Agreement;

  iv.    The Parties' Agreement requires that this dispute be first mediated and then litigated, and is not subject to expedited Fee Arbitration; and,

  v.    The expedited Fee Arbitration provision in the Parties' Agreement does not apply to invoices that are entirely disputed as illegitimate in the first instance.

B.    Award monetary damages on Counts II-VI, including double or treble their actual damages to the Berylsons on Count VI, in an amount to be determined at trial, plus contractual and/or statutory attorney's fees (as applicable), interest and costs;

C. Grant the Berylsons their application for temporary restraining order, preliminary injunction, and then permanent injunction on Count VII, plus contractual attorney's fees, interest and costs; and

D.  Award the Berylsons all further relief as this Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

John G. Berylson and Amy Smith Berylson,

By their Attorneys,

*/s/* William S. Rogers, Jr.
William S. Rogers, Jr., BBO No.549487
wsrogers@princelobel.com
Christopher Miller, BBO No. 685219
cmiller@princelobel.com
Matthew Madden, BBO No. 685738
mmadden@princelobel.com
Prince Lobel Tye LLP
One International Place
Boston, MA  02110
617-456-8000

Dated: March 26, 2021

iManageDB1\109089\000005\3676412.v3-3/25/21