# EXHIBIT 5

**Civil Action No.: 1:21-cv-10527-(RGS)**

**John G. Berylson and Amy Smith Berylson,**
**Plaintiffs,**

**v.**

**1100 Architect, P.C. and David Piscuskas,**
**Defendants.**

## EXPERT REPORT OF STEVEN SCOTT AND ANTHONY COCCARELLI

**DECEMBER 23, 2022**

# Table of Contents 

ACRONYMS & DEFINED TERMS ....................................................................5

1.0 INTRODUCTION .....................................................................................8

2.0 EXECUTIVE SUMMARY ..........................................................................9

    2.1    Approach and Methodology ...................................................... 9

    2.2    Summary of Expert Opinions ................................................... 10

3.0 EXPERT WITNESS QUALIFICATIONS.....................................................14

    3.1    Steven Scott ........................................................................ 14

    3.2    Anthony Coccarelli.................................................................. 14

4.0 BACKGROUND .....................................................................................15

5.0 1100'S MISMANAGEMENT AND DISCRETE DESIGN AND COORDINATION
       ISSUES ...............................................................................18

    5.1    1100's Mismanagement ......................................................... 18

          5.1.1   1100's Late and Incomplete Release of Drawings and
                 Specifications....................................................18

          5.1.2   1100's Disengagement from the Project and Insufficient Project
                 Team ...............................................................25

          5.1.3   1100's Failure to Complete the Basic Services and Replacement
                 Architect..........................................................28

    5.2    1100's Discrete Design and Coordination Issues ................................. 29

          5.2.1   Failure to Provide Complete Construction Documents Related to
                 the Dining Pavilion Glass Façade and Connection with the Dining
                 Pavilion Superstructure ................................................31

          5.2.2   Failure to Provide Complete Construction Documents Related to
                 the Dining Pavilion Roof and Interior ................................33

          5.2.3   Failure to Provide Complete Construction Documents Related to
                 the GEM Building Façade ...............................................35

          5.2.4   Failure to Provide Complete Construction Documents Related to
                 the Servery Door Detail.................................................40

          5.2.5   Failure to Provide Complete Construction Documents Related to
                 the GEM Building Dome.................................................41

    5.3    1100's Non-Compliant Billing ................................................... 42

5.3.1   1100's Misapplication of the Agreement's Definition of Cost of the Work ................................................................ 43

5.3.2   1100's Improper Application of the Agreement by Modifying Billing Structure to Solely Additional Services ................ 46

5.3.3   Accelerated Basic Services Billing Despite 1100's Incomplete Drawings .................................................................... 48

5.3.4   1100's Failure to Obtain Written Approval as Required for Additional Services ................................................... 50

**6.0  SCHEDULE DELAY ANALYSIS** ............................................ **52**

**6.1   Baseline – 1100 Baseline Schedule – 1100 Schedule** ........................... **57**

**6.2   Period 1: Baseline to July 28, 2018** ........................................ **58**

6.2.1   Period 1 – Overview .......................................................... 58

6.2.2   Period 1 – Detailed Schedule Analysis ............................ 60

6.2.3   Period 1 – Summary of Findings ..................................... 63

**6.3   Period 2: July 28, 2018 to May 15, 2019** ................................ **64**

6.3.1   Period 2 – Overview .......................................................... 64

6.3.2   Period 2 – Detailed Schedule Analysis ............................ 66

6.3.3   Period 2 – Summary of Findings ..................................... 71

**6.4   Period 3: May 15, 2019 to August 19, 2022** .......................... **72**

6.4.1   Period 3 – Overview .......................................................... 72

6.4.2   Period 3 – Detailed Schedule Analysis ............................ 73

6.4.3   Period 3 – Summary of Findings ..................................... 75

**7.0  DAMAGE QUANTIFICATION AND SUMMARY** ........................ **76**

**7.1   Quantification Methodology and Summary** ......................... **76**

7.1.1   1100's Compensation ....................................................... 77

7.1.2   Cost to Complete Architect's Basic Services .................. 81

7.1.3   Errors, Omissions, and Discrete Design Issues ............. 83

7.1.4   Schedule Delay .................................................................. 86

7.1.5   Interest ............................................................................... 87

**8.0  RESPONSE TO 1100'S CLAIM** ........................................... **89**

**8.1   Basic Services** ................................................................. **89**

**8.2   Additional Services – Hourly Basic Services** ...................... **90**

**8.3   Additional Services** ........................................................ **90**

**8.4   Expenses** ......................................................................... **90**

**8.5   Retainer** ............................................................................ **90**

**8.6    Response to 1100's Claim Conclusion** ................................................. **90**

**9.0 BREACH OF CONTRACT AND PECUNIARY DAMAGES** ........................**92**

**9.1    Breach of Agreement and Negligence by 1100** ................................ **92**

**9.2    Misrepresentations by 1100** ............................................................ **94**

9.2.1    Misrepresentations by 1100 at Agreement .......................................94

9.2.2    Misrepresentations by 1100 at Sea-Dar NTP..................................95

**10.0        CONCLUSION** ...........................................................................**97**

**ATTACHMENT 1 – CURRICULUM VITAE** .....................................................**99**

**ATTACHMENT 2 – INFORMATION RELIED UPON** .......................................**107**

**APPENDIX A – SCHEDULE DELAY ADDITIONAL CONTENT**....................**112**

**APPENDIX B – EXHIBITS**.............................................................................**113**

 **Acronyms & Defined Terms**

**Acronyms & Defined Terms**

| Acronym or Defined Term | Definition |
| --- | --- |
| **1100** | 1100 Architect, P.C. |
| **1100's Claim** | Damages as asserted within Defendants Revised and Updated Disclosure Statement, dated December 01, 2022 |
| **AACE** | The Association for the Advancement of Cost Engineering |
| **Additional Services** | As defined in Article 4 of the Agreement |
| **Agreement** | The Parties' July 06, 2016 executed AIA standard form agreement for architectural services pertaining to the Project |
| **AHJ** | Authorities Having Jurisdiction |
| **AIA** | American Institute of Architects |
| **AICPA** | American Institute of Certified Public Accountant |
| **AoR** | Architect of Record |
| **ASI** | Architect's Supplemental Instruction |
| **Berkshire** | Berkshire Wilton Partners, LLC |
| **Berylsons** | Collectively, John and Amy Berylson |
| **CA** | Construction Administration |
| **CD** | Calendar Days |
| **Connolly Concrete** | Connolly Concrete Construction, Inc. |
| **Counsel** | Prince Lobel Tye LLP |
| **Cost of the Work** | As defined in Article 6 of the Agreement |
| **CPM** | Critical Path Methodology |
| **DD** | Design Development |
| **Defendant(s)** | Individually, 1100 Architect, P.C. or David Piscuskas; Collectively, 1100 Architect, P.C. and David Piscuskas |

| Acronym or Defined Term | Definition |
|---|---|
| **Deloitte** or **Experts** or **Expert Witnesses** | Collectively, Mr. Steven Scott and Mr. Anthony Coccarelli, (the "Expert(s)" or "Deloitte") |
| **EoR** | Engineer of Record |
| **EPC** | Engineering, Procurement, and Construction |
| **FHP** | F.H. Perry Builder |
| **Frener + Reifer** | Frener + Reifer America, Inc. |
| **G.A.A.P.** | Generally Accepted Accounting Principles |
| **Gas Associates** | Gas Associates, Inc. |
| **Hirschmann** | H. Hirschmann LTD. |
| **Houghton** | Houghton Associates LLC. |
| **HVAC** | Heating, Ventilating, and Air Conditioning |
| **IFC** | Issued for Construction |
| **Information Relied Upon** | Case pleadings, depositions, interviews, and documents produced in this matter |
| **Indus Report** | Report of Sharon Lobo of Indus Architects PLLC, retained as Expert Witness by Counsel, dated December 23, 2022 |
| **Kauffman** | The matter of Kauffman v. Leard, 248 N.E.2d 480 (Mass. 1969). |
| **Key Employees** | As defined in the Agreement, Article 2.3 |
| **LLS Enterprises** | LLS Enterprises Corporation |
| **LNTP** | Limited Notice to Proceed |
| **Lussier** | Eric R. Lussier Corporation |
| **MEP** | Mechanical, Electric, and Plumbing |
| **MIP** | Method Implementation Protocol |
| **MPAD** | Martin Partners Architecture + Design, LLP |
| **NTP** | Notice to Proceed |
| **Owners** | Collectively, John and Amy Berylson |
| **Parties** | Collectively, 1100 Architect, P.C. and John and Amy Berylson |
| **Phoenix Bay** | Phoenix Bay Construction Co. Inc. |

| Acronym or Defined Term | Definition |
|---|---|
| **Piscuskas** | David Piscuskas |
| **Plaintiffs** | Collectively, John and Amy Berylson |
| **Project** | As defined in the Agreement, design and construction of the Berylson Residence located at 38 + 44 Highgate, Wellesley, MA |
| **Project Schedule** | As defined in the Agreement, Exhibit 3.1.3, "Design Schedule" dated July 06, 2016 |
| **Radius Track** | Radius Track Corporation |
| **RFI** | Request for Information |
| **RFP** | Request for Proposal |
| **Rinck** | Rinck, Inc. |
| **SD** | Schematic Design |
| **Sea-Dar** | Sea-Dar Enterprise, Inc. |
| **Sharon Lobo** | Individually, Sharon Lobo, AIA, NCARB of Indus Architects PLLC, retained as Expert Witness by Counsel |
| **SheltonMindel** | A registered service mark of Lee F. Mindel, Architect, D.P.C.[1] |
| **Skillings & Sons** | Skillings & Sons, Inc. ("Skillings & Sons") |
| **SM Haw** | SM Haw Asscoiates |
| **Swenson** | Swenson Stone Consultants, Ltd. |
| **TE2** | TE2 Engineering, LLC |
| **Thornton Tomasetti** | Thornton Tomasetti, Inc. |
| **Town** | Town of Wellesley, Massachusetts |

---

[1] 2022-10-06 Lee F. Mindel Deposition, Page 8

|  | **Introduction** |
| --- | --- |

## 1.0     Introduction

In connection with Prince Lobel Tye LLP's ("Counsel") representation of Amy Smith Berylson and John G. Berylson (collectively, the "Berylsons" or "Owners" or "Plaintiffs") inhis matter with 1100 Architect, P.C. and David Piscuskas (collectively "1100" or "Defendants", or individually as "Piscuskas" or "Defendant"), Deloitte Transactions and Business Analytics LLP ("DTBA") was retained by Counsel to analyze relevant documents and data to assist in Counsel's evaluation of disputed architectural services for renovation and new construction of the Owner's home at 38 + 44 Highgate in Wellesley, MA (the "Project") pursuant to an agreement executed by the Berylsons and 1100 on July 06, 2016 (the "Agreement").

This report (this "Report") sets forth the expert opinions of Mr. Steven Scott and Mr. Anthony Coccarelli (collectively, the "Expert Witnesses", "Deloitte", "we", "our" and "us") in this matter as well as the basis for such opinions. In performing the analyses described in this Report, the Expert Witnesses were assisted by personnel of DTBA and its affiliates working at our direction and under our supervision. We will be prepared to testify as to our work and opinions in this matter. We were also assisted by reference to Plaintiffs' architectural expert witness report of Sharon Lobo, AIA, NCARB of Indus Architects PLLC dated December 23, 2022 ("Indus Report"), and direct consultations with Sharon Lobo and other Project-related professionals and contractors ("Project Participants"), personally, as identified below. Our CVs are provided in **Attachment 1**.

In formulating our opinions, we were assisted by others at Deloitte Transactions and Business Analytics LLP and were compensated for the services of these personnel on an hourly basis. Mr. Scott's hourly rate for this engagement is $600, Mr. Coccarelli's hourly rate is $550, and the hourly professional service rates for the personnel supporting us in this matter range from $150 to $500. Deloitte Transactions and Business Analytics LLP's and our compensation do not depend upon the opinions or the conclusions we reached or the outcome of this case.

Specifically, we were retained to analyze and assess the following items:

- An analysis and assessment of any potential delay impacts and disruption to the Project

- An analysis and assessment of the damages related to disputed architectural services for the Project

- An analysis and assessment of the Cost of the Work

- An analysis and assessment of damages relevant to breach of Agreement, negligence, and misrepresentation(s)



| | Executive Summary |
|---|---|

## 2.0   Executive Summary

### 2.1   Approach and Methodology

This Report provides our expert opinions on a number of issues related to the dispute between the Berylsons and Piscuskas. Specifically, Counsel instructed DTBA to analyze and assess the following items: (i) potential delay impacts and disruption to the Project; (ii) disputed architectural services related to the Project; and (iii) the Cost of the Work performed, as defined in the Agreement (the "Cost of the Work").

We have independently reviewed Project documentation provided by Counsel including case pleadings, depositions, interviews, and other documents produced in this matter (collectively, "Information Relied Upon"). The Information Relied Upon is listed in Attachment 2. We have not been denied access or refused information or data that has been requested. We reserve the right to amend this Report if additional information relevant to the analysis becomes available.

We have not been retained to render an opinion, in accordance with generally accepted auditing standards, on the fairness, in all material respects, of the presentation of any financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"), International Financial Reporting Standards or Statutory Accounting Principles. The services were performed under the American Institute of Certified Public Accountants' ("AICPA") Statement on Standards for Consulting Services.

As part of our review, we performed a schedule analysis; in doing so we reviewed contemporaneous documentation prepared by 1100, Sea-Dar, and other consultants covering the period from June 2016 through November 2022.  We selected 1100's proposed initial Project Schedule[2] as the baseline schedule ("Baseline Schedule") and starting point to measure delay against key activities during the Project and compared the actual completion dates to the Baseline Schedule to quantify the delays to the critical path and other components of work. The purpose of the schedule analysis was to identify and analyze the delay events impacting the overall Project schedule, quantify the delays, and evaluate potential responsibility for those delays.  For purposes of analysis, we reviewed the Agreement between 1100 and Owner, and contemporaneous Project records to analyze the 1,253 Calendar Days ("CDs") days of delay and divided the schedule analysis into three distinct periods as described in Section 6.0 of this Report.

---

[2] Bates No(s). 1100APC0184640 – 1100APC0184669: Agreement between Amy & John Berylson and 1100 Architect PC, dated Jul. 06, 2016, Exhibit 3.1.3 "Design Schedule"

## 2.2    Summary of Expert Opinions

The Berylsons contracted with 1100 on July 06, 2016 for an estimated Project construction cost of $11.5 million[3] and the Project now is forecasted at an estimated construction cost of $35.9 million as of November 30, 2022.[4] This significant cost growth was due to the many actions and/or failures of Defendants. Additional background information regarding the Parties' dispute is provided in Section 4.0 of this Report.

Based on our work to date and as further described in this Report, we have formulated the following opinions:

1) 1100 mismanaged the Agreement, as described in more detail in Section 5.0 of this Report. 1100's mismanagement included the following:

- 1100 failed to adequately meet the Agreement's requirements with regard to staffing "Key Personnel" throughout the Project. It is also our understanding from the Indus Report[5] and SheltonMindel that 1100 submitted drawings and specifications that were often late or at an incomplete level of detail.

- 1100's mismanagement and incomplete drawings caused a number of discrete errors, omissions, and design issues that further delayed the Project Schedule and resulted in cost growth to the Project. The Berylsons were also forced to procure the services of additional design professionals to peer review and fill in gaps in services for much of 1100's work in an effort to address 1100's shortcomings and deficiencies. A replacement architect was also required to be retained after 1100 terminated the Agreement in March 2021.[6]

- 1100 frequently followed non-compliant billing practices and invoiced the Berylsons for unallowable costs.  These non-compliant billing practices included:

  o Improperly modifying 1100's monthly billing structure from (i) a percentage-based fee per the Agreement's definition of Cost of the Work, to (ii) an hourly-rate based fee subject to 1100's improper application of the Agreement's "Additional Services" definition

  o Mischaracterizing the Agreement's definition of Cost of the Work in conjunction with calculation of 1100's fees.

---

[3] Bates No(s). 1100APC0010556: 1100 Invoice No. "2016-0708", dated Jul. 31, 2016; Architectural fees total $2,127,500, based on the 18.5% "Basic Services" compensation implies the "Cost of the Work" is $11.5 million.
[4] Bates No(s). BWP_0186277: Berkshire total cost forecast of $34,053,219, dated Nov. 30, 2021, plus 1100APC0015748: Sea-Dar payments through Application for Payment #7 of $1,858,429
[5] Indus Report, dated Dec. 23, 2022, Sections D (II) – D (IV)
[6] First Amended Complaint of Plaintiffs, dated Oct. 08, 2021, Exhibit Q, which is inclusive of letter dated Feb. 17, 2021 with title "Notice of Suspension of Services and Termination of Agreement" and letter dated Mar. 04, 2021 with title "Notice of Suspension of Services and Termination of Agreement"

    o  Invoicing the Berylsons for full completion of the Basic Services associated with each respective  design phase, despite what we understand to be the incomplete nature of 1100's design deliverables.

    o  Neglecting to obtain written approval for Additional Services prior to performing such services, as is required per the Agreement

2) Our schedule analysis indicates several main delays that have been caused by 1100, as described in more detail in Section 6.0 of this Report. These include:

    o  Late start and completion of the Large House package drawings needed for approval;

    o  Late start and completion of the building permit set of drawings;

    o  Late and incomplete release of design drawings and construction documents;

    o  Late and incomplete release of Request for Proposal ("RFP") package;

    o  Late and incomplete release of Issue for Construction ("IFC") foundation drawings;

    o  Late release of GEM Cladding Stone mock-up strategy, selection of vendor, and release of drawings;

    o  High volume of RFIs particularly related to GEM Stone Design and coordination issues between GEM Cladding Stone drawings and Core and Shell structural drawing set;

    o  Design and coordination of structural steel framing drawings with the GEM Building and Dining Pavilion drawings;

    o  Lack of tolerances in the design details of the Dining Pavilion glass facade and connection with superstructure.

The results of our schedule analysis are summarized below:

| Period No. | Time Period Analyzed | Incremental Total Delay (CDs) | Cumulative Total Delay (CDs) | Incremental 1100 Responsibility (CDs) | Cumulative 1100 Responsibility (CDs) | Controlling Issues |
|---|---|---|---|---|---|---|
| 1 | June 13, 2016 – July 28, 2018 | 423 | 423 | 303 | 303 | Large House Approval – Building Permit – Contractor Selection |
| 2 | July 28, 2018 – May 15, 2019 | 291 | 714 | 155 | 458 | GEM Stone Design |
| 3 | May 15, 2019 – August 19, 2022 | 539 | 1,253 | 449 | 907 | GEM Stone Design |
| Total | | **1,253** | **1,253** | **907** | **907** | |

**Table 2-1: Summary of Delay Responsibility**

We have quantified damages and responded to 1100's claim in Sections 7, 8, and 9 within this Report.

The Defendants' "Revised and Updated Disclosure Statement"[7] asserts that 1100 is due $1,302,592 of purported damages under the pretense that 1100 was not paid for certain services ("1100's Claim"). We disagree with 1100's position, as described in more detail in Section 8.0 of this Report.

We understand from the Indus Report[8] that 1100 misrepresented material facts which caused damage to Plaintiffs, and that 1100 breached the Agreement and the corresponding the Standard of Care. We have quantified damages associated with these actions, as described in more detail in Section 9.0 of this Report. It is our understanding from counsel that such actions are subject to the "Benefit of the Bargain" principal, as specified in connection with the matter of *Kauffman v. Leard*[9], and we have quantified the associated damages. Separately, we understand from counsel that the Owners may claim any pecuniary loss in the form of costs that were incurred as a consequence of reliance on 1100's misrepresentations; we have quantified additional damages accordingly.

---

[7] Defendants' "Revised and Updated Disclosure Statement", dated Dec. 01, 2022
[8] Indus Report, dated Dec. 23, 2022
[9] 248 N.E.2d 480 (Mass. 1969).

Our summary of damages is as follows:

| Table 2-2: Summary of Damages | |
| --- | --- |
| **Description** | **Amount** |
| 1100's Compensation | $2,816,895 |
| Cost to Complete Architect's Basic Services | $1,181,935 |
| Errors, Omissions, and Discrete Design Issues | $215,057 |
| Schedule Delay | $1,308,205 |
| Interest | $1,144,099 |
| Response to 1100's Claim | $24,727 |
| **Subtotal** | **$6,690,918** |
| Breach of Agreement and Negligence | $11,788,046 |
| Misrepresentation at Agreement per Section 9.2.1 | $16,750,009 |
| Misrepresentation at Sea-Dar NTP per Section 9.2.2 | $13,086,456 |

 **Expert Witness Qualifications**

## 3.0    Expert Witness Qualifications

### 3.1    Steven Scott

Mr. Scott's relevant experience is comprised of project advisory, dispute resolution, investigations and risk management on both domestic and international projects. Steven is a professional engineer and has extensive experience in the resolution of construction disputes and the preparation of claims and construction investigations. Steven is also a Certified Construction Auditor ("CCA") and local Board Member of AACE.   He has managed the performance of construction and engineering analyses including schedule delay, disruption, acceleration, change orders, productivity and inefficiency, causation and entitlement, cumulative impact, damage quantification, and project controls and management systems.

Mr. Scott's select experience related to litigation and dispute support services includes: (i) serving as lead testifying expert under ICC Arbitration for the development of a multi-billion facility related to disputed invoices (ii) serving as engagement lead for forensic cost audit services, loss of productivity, and schedule delay analysis related to the development of a $900 million mixed-use building being constructed, in which work products included mediation presentation, expert report and rebuttal report, and (iii) leader of engagement team in collaboration with Counsel to develop CPM schedule delay analyses, productivity interference impacts, analysis and assessment of counterclaims, and analysis and assessment of cost impacts and quantification of damages for the construction of a manufacturing facility and related site work. Work product included a presentation in advance of mediation with the Owner.

### 3.2    Anthony Coccarelli

Mr. Coccarelli' s relevant experience is comprised of project advisory services, including business process redesign, procedure development, risk management, construction auditing, contract reviews, project delivery and compensation assessments, PMO services, and project systems evaluation and implementation. Having been involved in planning, design, and construction for over 25 years, Anthony has been able to gain experience and knowledge in multiple facets of the project lifecycle, ranging from initial planning and feasibility, design, coordination, and cost estimating to construction administration and project turnover and use.

Mr. Coccarelli's select experience related to residential construction projects includes: (i) Planning Design and Construction services for a landmarked townhouse in New York City, including supporting full architectural services in conjunction with the gut renovation and expansion of a landmarked townhouse and the coordination of approvals with the New York City Building Department, Board of Zoning and Appeals and New York City Landmarks Preservation Commission, and (ii) planning, design, and construction of 23 high-end residential condominium units, which was inclusive of complete gut renovation, project coordination, and service as design and construction supervisor.

**Detail**

1100 invoiced the Berylsons for 100% completion of the Construction Documents phase as of June 2019; despite this, Project records indicate that much of the GEM Building design was still incomplete after June 2019 and that the design was even incomplete at the time 1100 terminated the Agreement in March 2021. For example, and as noted in Section 5.2.4 of this Report, Thornton Tomasetti reviewed 1100's December 31, 2019 GEM Building drawing set and observed several items still in need of coordination, such as issues pertaining to the GEM Building's domed roof.

After 1100 terminated the Agreement, MPAD indicated that the GEM Building dome as designed at that time would have resulted in a significant gap between the dome's glass and the GEM Building interior.

**Marc Newman (*Architect of Record* at MPAD)** stated that:

> *(1100) had erroneously left the project with a four - foot aperture at the top of the ceiling. The piece of glass up there is 10 feet in diameter and (the Berylsons were) going to inherit four feet a four - foot aperture from 10 feet of glass ... Ms. Berylson had no idea so we addressed that, made use of the as much of the 10 feet of glass as possible. So that changed the profile of the gem dome internal ceiling.* [120]

Rectifying this error required changes to the scope of the roof framing subcontractor, Radius Track Corporation ("Radius Track"). [121]

Refer to Section 7.1.3 of this Report for details regarding damages associated with 1100's failure to design and coordinate the GEM Building dome.

## 5.3   1100's Non-Compliant Billing

1100 implemented several billing practices that were contrary to the terms of the Agreement. These include:

- Misapplying the Agreement's definition of Cost of the Work, thus resulting in 1100's increased fee for Basic Services

- Improperly applying Article 4.3.3 of the Agreement by billing all services as of September 2019 as "Additional Services", which the Agreement indicated was only applicable if the Project Schedule were delayed "through no fault of the architect."

- Invoicing for full completion of Schematic Design, Design Development, Construction Documents, and Construction Administration, despite the fact that 1100's design appears to have been incomplete at each stage.

---

[120] Marc Newman Deposition, Day 1,  Pages 277 - 278
[121] Bates No(s). BERYLSON0006511 - BERYLSON0006534: Berkshire Change Order No. 06, dated Apr. 01, 2022

- Invoicing for Additional Services without written approval

Refer to Sections 5.3.1, 5.3.2, 5.3.3, and 5.3.4 for more detail.

### 5.3.1    1100's Misapplication of the Agreement's Definition of Cost of the Work

**Summary**

The Agreement specifies that 1100's fee for Basic Services was to be 18.5% of the Cost of the Work, which is defined as "the total cost to the Owner to construct all elements of the Project designed or specified by the Architect." 1100 misapplied the terms of the Agreement when computing the Cost of the Work by incorporating costs for various elements of scope that 1100 did not design or specify.

**Detail**

The Agreement indicated that 1100's compensation for Basic Services ("Basic Services Fee") shall be equal to 18.5% of the Cost of the Work.[122] The Agreement defined the Cost of the Work as follows:

> *For purposes of this Agreement, the Cost of the Work shall be the **total cost to the Owner to construct all elements of the Project designed or specified by the Architect**, which includes all built-in surface finishes, fixtures and hardware, and shall include contractors' general conditions costs and overhead as approved by the Owner in writing. **The Cost of the Work does not include the compensation of the Architect, any consultants and Interior Designer, any other "soft" costs nor the costs of the land, rights-of-way, financing, contingencies for changes in the Work or other costs that are the responsibility of the Owner**. In the event that the Owner's Interior Designer specifies built-in finishes, fixtures and hardware, the Cost of the Work, for the purpose of calculating the Architect's compensation, shall include the fair market value of those items.*[123]

The Agreement therefore limited 1100's compensation for Basic Services to those "elements of the Project designed or specified by the Architect." The "Architect" includes 1100 and any consultants it retains via subcontract.

1100 did not contract with any of the major design consultants involved on the Project.  Rather, the Berylsons contracted directly with the following design consultants ("Owner's Consultants"):

- A.S. Elliott, SDC (Surveyor)
- Certified Energy (HERS Testing)

---

[122] Bates No(s). 1100APC0184640 – 1100APC0184669: Agreement between Amy & John Berylson and 1100 Architect PC, dated Jul. 06, 2016, Article 11.1

[123] Bates No(s). 1100APC0184640 – 1100APC0184669: Agreement between Amy & John Berylson and 1100 Architect PC, dated Jul. 06, 2016, Article 6.1 (emphasis added)

43

- D'Antonio Engineers (MEP Engineer)
- Doyle Engineering (Civil Engineer)
- Dudka Criterium Engineers (Peer Review of Surveyor)
- Frener & Reifer America Inc. (Facade Engineer)
- Gale Associates (Waterproofing)
- Houghton Group (Acoustical)
- James Meehan (Lighting Protection)
- Lee F. Mindel. Architect, DPC (Interior Designer)
- Reed Hilderbrand LLC (Landscape Architect)
- Sanborn Head & Associates Inc (Geotechnical Engineer)
- Sean O'Connor Lighting (Lighting Designer)
- Silman Associates (Structural Engineer)
- Steven Winter (Waterproofing)
- System 7 (AV/IT Consultant)
- TE2 Engineering, LLC (MEP Engineer)
- Thornton Tomasetti (Facade / Waterproofing Peer Reviewer)
- UTS of Massachusetts (Testing)
- Wald Studios (Lighting Design)

The cost to construct the discrete elements of the Project which were exclusively designed or specified by the Owner's Consultants, rather than by 1100, are excluded from the Agreement's definition of the Cost of the Work, and should therefore be excluded from the calculation of 1100's percentage-rate fee for Basic Services. Despite this, 1100's monthly invoice records demonstrate that 1100 included cost for work related to the services of Owner's Consultants as part of 1100's calculation of the Cost of the Work and, thus, 1100 improperly included this increased cost amount in the calculation of its percentage-rate compensation for Basic Services.

In his deposition, Piscuskas confirmed that 1100 did not design or specify certain portions of the work, which are associated with the services of Owner's Consultants or the contractor:
- Concrete and related mix designs[124]
- Geothermal system and related equipment[125]
- Underpinning[126]
- Electrical systems, including power, utility systems, and generator assemblies[127]
- Mechanical systems and equipment, including air handlers, boilers, heat pumps, radiant heating, and snow melting system[128]
- Structural steel[129]

---

[124] 2022-11-18 David Piscuskas Deposition, Page 229
[125] 2022-11-18 David Piscuskas Deposition, Pages 231-232
[126] 2022-11-18 David Piscuskas Deposition, Page 233
[127] 2022-11-18 David Piscuskas Deposition, Pages 234-235
[128] 2022-11-18 David Piscuskas Deposition, Pages 235-236
[129] 2022-11-18 David Piscuskas Deposition, Page 236

44

Piscuskas further corroborates this understanding in 1100's estimate for the Cost of the Work where he removes the landscaping costs from the Cost of the Work.[130]  Moreover, Rich Roberts indicated that Piscuskas attempted to "break down the cost of construction"[131] over several iterations because "[t]here was uncertainty on David's part how to calculate his fee."[132] These actions demonstrate that Piscuskas had doubts about 1100's own calculation of the Cost of the Work and its appropriateness.

Additionally, the parties made use of a standard AIA template as the basis for their Agreement, upon which the parties substantially modified before formally executing the Agreement. This process is typical practice within the residential construction industry, as standard AIA templates are often (i) utilized as the initial basis of understanding between a given owner and contractor, (ii) modified with any specific language negotiated by the parties, and (iii) formalized per the parties execution of a final contract in which the modified language is included.

The AIA B101-2007 standard template utilized by the Parties includes the following language in which profit is incorporated as a component of the definition of the Cost of the Work:

> § 6.1 For purposes of this Agreement, the Cost of the Work shall be the total cost to the Owner to construct all elements of the Project designed or specified by the Architect and shall include contractors' general conditions costs, **_overhead and profit_**. The Cost of the Work does not include the compensation of the Architect, the costs of the land, rights-of-way, financing, contingencies for changes in the Work or other costs that are the responsibility of the Owner. [133] [**_with emphasis_**]

However, the specific language included in the Parties' Agreement deliberately _excludes_ profit within its definition of Cost of the Work.  Specifically, the Agreement states the following:

> § 6.1 For purposes of this Agreement, the Cost of the Work shall be the total cost to the Owner to construct all elements of the Project designed or specified by the Architect, which includes all built-in surface finishes, fixtures and hardware, and shall include contractors' general conditions costs **_and overhead_** as approved by the Owner in writing. The Cost of the Work does not include the compensation of the Architect, any consultants and Interior Designer, any other "soft" costs nor the costs of the land, rights-of-way, financing, contingencies for changes in the Work or other costs that are the responsibility of the Owner. In the event that the Owner's Interior Designer specifies built-in finishes, fixtures and hardware, the Cost of the Work, for the purpose of calculating the Architect's compensation, shall include the fair market value of those items.[134] [**_with emphasis_**]

---

[130] Bates No(s). 1100APC0219914 - 1100APC0219915: 1100 Budget Spreadsheet. dated Aug. 11, 2020
[131] 2022-10-19 Richard Roberts Deposition, Pages 76 - 77
[132] 2022-10-19 Richard Roberts Deposition, Page 77
[133] AIA B101-2007, Article 6.1 (emphasis added) (https://content.aia.org/sites/default/files/2016-09/AIA-B101-2007-Free-Sample-Preview.pdf)
[134] Bates No(s). 1100APC0184640 – 1100APC0184669: Agreement between Amy & John Berylson and 1100 Architect PC, dated Jul. 06, 2016, Article 6.1 (emphasis added)

Markup for the various contractors' profit should therefore be excluded from 1100's calculation for the Cost of the Work.  Despite this, 1100 consistently included these costs within its computation for the Cost of the Work as included in 1100's monthly invoices. Berkshire indicated that 40% of its 12% markup for "Overhead and Profit" represented profit.[135]

Refer to Section 7.1 of this Report for details of the computation of the damages associated with 1100's misapplication of the Agreement's definition of Cost of the Work.

### 5.3.2    1100's Improper Application of the Agreement by Modifying Billing Structure to Solely Additional Services

**Summary**

1100 modified their invoicing structure in mid-2020 retroactively such that all services were billed as "Additional Services" and subject to an hourly rate, despite the fact that the Project Schedule was delayed in large part due to 1100. This was contrary to Article 4.3.3 of the Agreement in which it is specified that such a change was only to occur "within thirty-nine (39) months of the date of this Agreement, **through no fault of the Architect** … ."[136]

**Detail**

Contractual Requirements

The Agreement indicated that "Invoices shall be submitted by the Architect to the Owner on a monthly basis" and that "Payments for services shall be made monthly." Despite this, 1100 failed to submit a monthly invoice to the Berylsons between April 2020 and August 2020. Indeed, invoice records indicate that 1100 finally submitted an additional monthly invoice dated August 31, 2020 including charges dating back to November 2019. At this time, 1100 transitioned from a billing structure (i) aligned with 18.5% of the Cost of Work for Basic Services plus hourly billing for Additional Services, to (ii) a billing structure *exclusively* based on hourly billing as Additional Services.

The Agreement stated that "If the services covered by this Agreement have not been completed within thirty-nine (39) months of the date of this Agreement, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as Additional Services." 1100 appears to justify their change in billing structure under the premise that "39 months of the date of this Agreement" corresponds to October 2019, and that 1100 is entitled to bill for any additional work beyond that date as an hourly Additional Service. 1100's position, however, dismisses the fact that the Agreement qualifies the 39-month timetable by specifically stating that any extension beyond this date should be "through no fault of the Architect".

---

[135] Interview with Paul Reiss of Berkshire on Nov. 22, 2022 with the Expert Witnesses and Counsel
[136] Bates No(s). 1100APC0184640 – 1100APC0184669: Agreement between Amy & John Berylson and 1100 Architect PC, dated Jul. 06, 2016, Article 4.3.3

 **Damage Quantification and Summary**

## 7.0    Damage Quantification and Summary

### 7.1    Quantification Methodology and Summary

We separate the damages calculated in this matter into five categories: (1) 1100's compensation, (2) professional fees related to 1100's non-performance, (3) errors, omissions, and discrete design issues, (4) schedule delay, and (5) interest. It is our opinion to a reasonable degree of certainty that Plaintiffs incurred $6,666,190 in damages caused by 1100 as further outlined in the table below.

| Table 7-1: Summary of Damage Quantification | Reference | Amount (in USD) |
|---|:---:|:---:|
| **7.1 1100's Compensation** | **A = B + C** | **$2,816,895** |
| 7.1.1 Basic Services | B | $2,360,976 |
| 7.1.2 Additional Services | C | $455,919 |
| | | |
| **7.2 Cost to Complete Architect's Basic Services** | **D = E** | **$1,181,935** |
| 7.2.1 Additional Cost to Complete Architect's Basic Services | E | $1,181,935 |
| | | |
| **7.3 Errors, Omissions, and Discrete Design Issues** | **F = G + H + I + J + K** | **$215,057** |
| 7.3.1 Failure to Provide Complete Construction Documents Related to the Dining Pavilion Glass Façade and Connection with Dining Pavilion Superstructure | G | $46,600 |
| 7.3.2 Failure to Provide Complete Construction Documents Related to Dining Pavilion Roof and Interior | H | $60,185 |
| 7.3.3 Failure to Provide Complete Construction Documents Related to the GEM Building Façade | I | $48,458 |
| 7.3.4 Failure to Provide Complete Construction Documents Related to the Servery Door Detail | J | $7,645 |

| 7.3.5 Failure to Provide Complete Construction Documents Related to the GEM Building Dome | K | $52,169 |
|---|:---:|---:|
| | | |
| **7.4 Schedule Delay** | **L = M + N** | **$1,308,205** |
| 7.4.1 Direct Costs Related to Schedule Delays | M | $122,225 |
| 7.4.2 Delay Damages - Contractor's General Conditions | N | $1,185,980 |
| | | |
| **7.5 Interest** | **O = P + Q + R + S** | **$1,144,099** |
| 7.5.1 Interest on Damages Related to 7.1 1100's Compensation | P | $886,595 |
| 7.5.2 Interest on Damages Related to 7.2 Cost to Complete Architect's Basic Services | Q | $61,912 |
| 7.5.3 Interest on Damages Related to 7.3 Errors/Omissions | R | $12,766 |
| 7.5.4 Interest on Damages Related to 7.4 Schedule Delay | S | $182,826 |
| | | |
| **Total** | **T = A + D + F + L + O** | **$6,666,190** |

### 7.1.1    1100's Compensation

It is our opinion to a reasonable degree of certainty that Plaintiffs suffered $2,816,895 in damages associated with 1100's compensation.  See Exhibit 7-1 for a summary of the calculations included in Section 7.1.1. and 7.2.1. [199]

| Table 7-2: Summary of Damage Quantification | |
|---|---|
| **Scope of Work** | **Amount** |
| Basic Services | $2,360,976 |
| Additional Services | $455,919 |
| **Total** | **$2,816,895** |

---

[199] Exhibit 7-1 is included within Appendix B of this Report.

Basic Services (See Section 5.3.1)
**Associated Damages: $2,360,976**

1100 failed to properly calculate the Basic Services Fee based on a percentage of the Cost of the Work and failed to provide an accurate percentage of completion for each phase of services, resulting in overstated invoices to the Plaintiffs.  1100's Basic Services Fee was recalculated to exclude elements of the Project not designed or specified by 1100. The percentage of completion was recalculated based on the testimony reflected in Marc Newman's deposition.[200]  The results are summarized in the table below and the values are further defined below in this section of the report.

| Table 7-3: Summary of Basic Services Damages | | |
|---|---|---|
| **Description** | **Amount** | |
| 1100's Basic Services Fee | $3,276,846 | A |
| Percent Completion | 28.7% | B |
| **Basic Services Fee Earned to Date** | **$941,274** | C = A × B |
| Less: Amount Paid to Date for Basic Services | $3,302,250 | D |
| **Credit Due from 1100 for Services Completed to Date** | **$2,360,976** | E = D – C |

*Cost of the Work Calculation*

As noted above, the Architect's compensation for Basic Services is based on the Cost of the Work multiplied by 18.5%. 1100's calculation for the Cost of the Work does not accurately reflect the "elements of the project designed or specified by the Architect." [201] To evaluate the calculation of the Cost of the Work as defined in the Agreement, we analyzed 1100's existing calculation for the Cost of the Work, noting the date and version of the estimate used as well as any scope exclusions or estimate adjustments made by 1100 to determine the applicable Cost of the Work.

To determine the appropriate version (date of preparation) of the Project cost estimate to use for the Cost of the Work calculation, we took into consideration (1) the requirements of Section 4.3.3 of the Agreement and (2) 1100's responsibility for delays to the project as discussed in Sections 5.3.2 of this Report.  Based on this approach, we used 1100's final estimate of the Cost of the Work, which is referenced in a letter dated August 24, 2020 from David Piscuskas to Jon Grippo:[202]

---

[200] 2022-11-04 Marc Newman Deposition Day 2, Exhibit 19
[201] Bates No(s). 1100APC0184640 – 1100APC0184669: Agreement between Amy & John Berylson and 1100 Architect PC, dated Jul. 06, 2016, Article 6.1
[202] Bates No(s). 1100APC0024109: Excerpt from page 2 of 1100 letter to Goulston Storrs, dated Aug. 24, 2020

| Table 7-4: Total Estimated Construction Costs | |
|---|---:|
| Berkshire Wilton Partners - under-roof construction | $24,250,000 |
| Berkshire Wilton Partners - site work | $846,596 |
| Sea-Dar Construction - usable project elements | $1,278,696 |
| **Total Estimated Construction Costs for billing purposes** | **$26,375,292** |

Supporting details for these values are provided in (1) a summary estimate maintained by 1100 ("1100's Estimate")[203] which is derived from (2) a detailed estimate (dated February 13, 2020) originally produced by Berkshire with modifications made by 1100 ("Lipson Budget").[204]  The Lipson Budget was the original basis for 1100's Estimate and it was modified to account for changes in the Project's anticipated cost as of August 2020.

With the details available from 1100's Estimate and the Lipson Budget, we identified costs related to work that 1100 did not design or specify as confirmed by (1) 1100's own assessment of scope exclusions and (2) Piscuskas's deposition as noted in section 5.3.1 of this Report.  These costs are excluded from the Agreement's definition of the Cost of the Work and therefore are excluded from the calculation below for 1100's Basic Services fee:

| Table 7-5: 1100's Basic Services Fee | |
|---|---:|
| Cost of the Work - Designed/Specified by 1100[205] | $17,712,680 |
| Multiplied by: Fee Percentage for Basic Services[206] | 18.5% |
| **1100's Basic Services Fee** | **$3,276,846** |

*1100's Basic Services Completed to Date*

To determine 1100's Basic Services completed to date, we relied on (1) an initial analysis provided by SheltonMindel, who assessed the completeness of 1100's services and (2) an amended assessment of 1100's percent of completion by phase subsequently provided by Marc Newman of MPAD.[207]  Based on this assessment, completion percentages were calculated for each phase and applied to the revised calculation of 1100's Basic Services Fee:

[203] Bates No(s). 1100APC0219914 - 1100APC0219915: 1100 Budget Spreadsheet, filename dated Aug. 11, 2020
[204] Bates No(s). 1100APC2027792 - 1100APC2027828: 1100 Budget Estimate, dated Feb. 13, 2020
[205] See Exhibit 7-2 - Cost of the Work; Exhibit 7-2 is included within Appendix B of this Report.
[206] Bates No(s). 1100APC0184640 – 1100APC0184669: Agreement between Amy & John Berylson and 1100 Architect PC, dated Jul. 06, 2016, Article 11.1
[207] 2022-11-04 Marc Newman Deposition Day 2, Exhibit 19, Pages 396 - 401

**Appendix B – Exhibits**

**Expert Report of Steven Scott and Anthony Coccarelli**
Exhibit 7-1 - Calculations for 7.1.1 Basic Services and 7.1.2 Additional Cost to Complete Architect's Basic Services

| A | B | | 7.1.1 1100's Compensation - Basic Services | | | | | | G - H | | | 7.2.1 Additional Cost to Complete Architect's Basic Services | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | C | D | E | | F | G | H | I | E - G | K | J + K | | | M + N | L - O | |
| | | 1100 Calculation | Revised Calculation | | Completed to Date | | | Payment/Credit Due | | 1100 Balance to Complete Basic | 1100 Additional | 1100 Total Cost to | Balance to Complete | | | | |
| | | | Adjustments for | | | | | | | | | | SheltonMindel | | Actual Cost to | | |
| Phase | Contractual % Allocation | Basic Services Contract Value | Scope Not Designed/Specified | Recalculated Fee | % Complete | Completed Amount | Paid to Date | Payment/(Credit) Due | | Services | Services Required for Completion | Complete | Payments through 11/15/2021 | MPAD Contract Value | Complete Basic Services | Damages |
| | | | | C + D | | | E x F | | | | J | K | L | M | N | O | P |
| Schematic Design | 22% | $1,073,474 | ($352,568) | $720,906 | 82.50% | $594,747 | $854,700 | ($259,953) | $126,159 | $0 | $126,159 | | $0 | $0 | $126,159 |
| Design Development | 22% | $1,073,474 | ($352,568) | $720,906 | 15.00% | $108,136 | $854,700 | ($746,564) | $612,770 | $43,466 | $656,236 | | $823,500 | $823,500 | ($167,264) |
| Construction Documents | 23% | $1,122,269 | ($368,594) | $753,674 | 15.00% | $113,051 | $893,550 | ($780,499) | $640,623 | $52,159 | $692,782 | | $988,200 | $988,200 | ($295,418) |
| Bidding | 3% | $146,383 | ($48,078) | $98,305 | 15.00% | $14,746 | $116,550 | ($101,804) | $83,560 | $8,693 | $92,253 | | $164,700 | $164,700 | ($72,447) |
| Construction Administration | 30% | $1,463,829 | ($480,775) | $983,054 | 11.25% | $110,594 | $582,750 | ($472,156) | $872,460 | $69,545 | $942,005 | | $1,317,600 | $1,317,600 | ($375,595) |
| Investigation, Onboarding, and Transition Costs | | | | | | | | | $0 | $0 | | $397,369 | | $0 | ($397,369) |
| **Total - Basic Services** | **100%** | **$4,879,429** | **($1,602,583)** | **$3,276,846** | **28.7%** | **$941,274** | **$3,302,250** | **($2,360,976)** | **$2,335,572** | **$173,863** | **$2,509,434** | **$397,369** | **$3,294,000** | **$3,691,369** | **($1,181,935)** |

**Expert Report of Steven Scott and Anthony Coccarelli**
Exhibit 7-2 - Cost of the Work

**Summary**

| Description | Amount | Fee for Basic Services 18.5% |
|---|---|---|
| Cost of the Work - 1100's Calculation | 26,375,292 | 4,879,429 |
| Cost of the Work - Designed/Specified by 1100 | 17,712,680 | 3,276,846 |
| **Increase / (Reduction)** | **(8,662,613)** | **(1,602,583)** |

| | | 1100 Calculation | | | | Eligible Cost of the Work | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | A + B + C D | E | F | E + F G | |
| CSI | Description | 1100 Total Cost "Under the Roof" | 1100 Total Cost Site Work | 1100 Total Cost SDC Usable Work | Cost of the Work (Aug 24 2020) | Amount Designed / Specified by 1100 | Amount Not Designed / Specified by 1100 | Total | Design Responsibility for Adjusted Scope |
| 01000 | General Conditions | 2,629,725 | - | - | 2,629,725 | 1,841,108 | 788,617 | 2,629,725 | Contractor's General Conditions |
| 02000 | Sitework | 174,725 | 656,511 | 356,982 | 1,188,218 | 12,982 | 1,175,236 | 1,188,218 | Civil/Landscape |
| 03000 | Concrete | 990,049 | 80,044 | - | 1,070,093 | 12,884 | 1,057,209 | 1,070,093 | Structural |
| 04000 | Masonry | 2,360,001 | - | 78,600 | 2,438,601 | 2,438,601 | - | 2,438,601 | Civil/Landscape |
| 05000 | Metals | 873,436 | - | - | 873,436 | 371,951 | 501,485 | 873,436 | Structural |
| 06000 | Wood and Plastics | 2,733,243 | - | - | 2,733,243 | 2,733,243 | - | 2,733,243 | 1100 Architect |
| 07000 | Thermal and Moisture Protection | 1,182,069 | - | - | 1,182,069 | 1,134,808 | 47,261 | 1,182,069 | Civil/Landscape |
| 08000 | Doors and Windows | 3,635,494 | - | 556,116 | 4,191,610 | 4,191,610 | - | 4,191,610 | 1100 Architect |
| 09000 | Finishes | 2,275,650 | - | - | 2,275,650 | 2,275,650 | - | 2,275,650 | 1100 Architect |
| 10000 | Specialties | 59,533 | - | - | 59,533 | 59,533 | - | 59,533 | 1100 Architect |
| 11000 | Equipment | 151,967 | - | - | 151,967 | 151,967 | - | 151,967 | 1100 Architect |
| 12000 | Furnishings | - | - | - | - | - | - | - | 1100 Architect |
| 13000 | Special Construction | 6,125 | - | - | 6,125 | 6,125 | - | 6,125 | 1100 Architect |
| 14000 | Conveying Systems | 98,340 | - | - | 98,340 | 98,340 | - | 98,340 | 1100 Architect |
| 15000 | Mechanical | 2,119,174 | - | 170,500 | 2,289,674 | 95,000 | 2,194,674 | 2,289,674 | MEP |
| 16000 | Electrical | 1,825,704 | - | - | 1,825,704 | 694,570 | 1,131,134 | 1,825,704 | MEP |
| OH&P | OH&P | 2,533,828 | 88,387 | 89,043 | 2,711,257 | 1,163,513 | 1,547,745 | 2,711,257 | Adjustment for Contractor's Profit |
| Insurance | Insurance | 620,788 | 21,655 | 27,455 | 669,897 | 450,646 | 219,252 | 669,898 | 1100 Architect |
| Adjustment | Rounding | (19,851) | - | - | (19,851) | (19,851) | - | (19,851) | 1100 Architect |
| | **Total** | **24,250,000** | **846,596** | **1,278,696** | **26,375,292** | **17,712,680** | **8,662,613** | **26,375,292** | |
| | Trade Cost Subtotal[1] | | | | | 14,257,414 | 6,106,999 | 20,364,413 | |
| | Trade Cost as % of Total | | | | | 70% | 30% | | Allocation used for General Conditions costs |

**Notes**
[1] "Trade Cost" is the total cost excluding General Conditions, Overhead & Profit, and Insurance. The "Trade Cost as % of Total" is used to allocate Contractor's General Conditions.