# EXHIBIT 33

| | |
|---|---|
| **From:** | David Piscuskas |
| **Sent:** | Monday, September 21, 2020 1:04 PM |
| **To:** | John Berylson |
| **Subject:** | 38 Highgate |

John,
Hope you had a good week-end.

We agree on many things, including the fact that yes, I did offer a revision on our original deal to the following rates: 18.5% to 21 million construction costs, 16% above 21 million.

The construction costs include 1.28million of SeaDar work that was – as reviewed and agreed upon by all professionals involved in the project – usable. This work is largely complete. The construction costs also include site work costs and a current house 'under-roof' target estimate of 24.25million.

[Note 1: This figure excludes approx. 600k of not-usable or not-legitimate work/invoices from SeaDar.]

[Note 2: The 24.25mil includes cost savings that Amy has not accepted, as made clear to Jon Grippo, but which I am confident can be realized. We met with Amy last fall and presented adjustments that would yield 3 to 4 million dollars of savings off of this total. From our menu of options to save costs, most were denied, per her notes in her writing. When, in your office in late January, you asked me to reduce the cost by 5 million, we enhanced the menu of options. Amy was open to about 15-20% of that list; nonetheless I've remained optimistic that more savings can be achieved.]

[Note 3: It's also worth restating that SeaDar was forecasting costs of approximately $5million above their $19.4 million, based on the hundreds of sheets drawings that were prepared in close dialogue with Amy. SeaDar's low estimation? One, a lack of comprehension and high-quality ability that, two, they then showed they could not improve upon.]

I appreciate your concurrence about our mutual frustration about SeaDar. It would have been much worse had they stayed, and their behavior since they left speaks for itself.

To your comments about our contract – 'far from unfair' per your text –  relative to other architects:

Our services on your project are high-end; this project requires – simultaneously – high-end, high-touch, high-ability service.

The range of these services include Town of Wellesley issues, and overturning their historical ruling that they imposed *after* a successful Large House approval; the abilities to address nitty-gritty construction issues, as well as knowledge and capability to use innovations that have been requested (eg structural glass because no columns around dining pavilion); the ability to transition easily to interior dialogues and decisions with Amy about every form of material and quality finish and type of furniture that suit her tastes. I admire Amy's taste, her exacting standards, and her attention to detail. It is – as you know – demanding and refined.

1100APC0024346

Like you, I want to get the project done. The sooner, the better. In this, I have consistently advocated your having as many of your books on hand and close as possible.

In your text message on Saturday, you asked me what the issue is.

There are two issues.

One: The process of managing your directive to lower costs – a pursuit I agree with, for which we have prepared several strategies, and continue to pursue viable options to achieve – is fitful because it stands apart from other directions we are regularly given about the project, be it phasing, finish, or scope.

For example, there is a difference between hearing for the first time this past March that original 38 'is only a renovation' …. and the oft-repeated directives to "take it down to the studs" we've been given before – and after – the renovation statement. In any case, building and re-building piece-by-part is slow going. And, to be clear, we have found savings on the 44 side, and have more on the table. I believe too that money and time can be saved on the reconstruction of 38.

In this, Rich Roberts, I, and my team mutually agree on ways to save money and time on the project. However, reconciling the disconnect between your wishes about cost and Amy's wishes about scope and process can only occur if you and she trust the team to extend its best professional efforts to do so.

Reconciliation of the divergences between cost, scope, and process – with even small adjustments about process and scope – would shorten time and lower costs, both to your benefit. Many suggestions that deliver quality and lower costs have been put forward over the course of the past three years, and have been rejected. I'm as frustrated by this as you are.

Two: The second issue is compensation.

You requested adjustments to my fees; I offered several hundred thousand dollars of revisions and concessions in basic services and hourly services, including lowering fee percentage, and explained all of them to Jon Grippo in detail.

Yes, what you have paid is a fact, and it's a considerable sum over the course of almost five years, several town proceedings, several pricing estimates, and several hundred drawings. Yet, fees for basic services are outstanding and still need to be accounted per the cost of the work we have been asked to prepare, through the extent of its completion. Also, fees for hourly additional services to support specific tasks need to be reconciled. Despite not having been paid anything since January I have continued to work on the project in good faith, trusting in our original agreement.

You reference reviewing a number of architects' contracts. Other architects provide and value their services differently, many at lesser value, while a good number cost more than we. You may also believe there is another architect better suited to reconcile and resolve the challenges of aesthetic objectives, craft and quality, and time and money that prevail on this project.

If that is so, you are free to hire another architect to complete the project. Notwithstanding its inherent complexities, you might save a percentage point or two, or not. I simply ask that I be compensated per our original agreement, with the considerations that I offered to you and Jon Grippo, for the uncompensated time and effort expended this year on your behalf.

1100APC0024347

Yours,
David


--
**DAVID PISCUSKAS** FAIA LEED AP
FOUNDING PRINCIPAL

**1100:** ARCHITECT

475 TENTH AVENUE **NEW YORK** NY 10018
T 212 645 1011 • F 212 645 4670 • M 917 847 5081
WWW.1100ARCHITECT.COM

2017 PRESIDENT - AIA NEW YORK

1100APC0024348