UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 21-10527-RGS

JOHN BERYLSON and AMY BERYLSON

v.

1100 ARCHITECT, P.C. and DAVID PISCUSKAS

MEMORANDUM AND ORDER
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

June 26, 2023

STEARNS, D.J.

John and Amy Berylson brought this lawsuit against their former residential architect, 1100 Architect, P.C. (1100), and its principal, David Piscuskas.  In this fractious and protracted dispute, the Berylsons seek damages, declaratory judgment, and injunctive relief for defendants' alleged misconduct stemming from 1100's architectural services and billing practices.  Specifically, the Berylsons accuse 1100 of breach of contract (Count II), breach of the implied covenant of good faith and fair dealing (Count III), and negligence and architectural malpractice (Count VI).  They also sue both defendants for fraud in the inducement (Count IV), fraud (Count V), tortious interference (Count VII), and alleged violations of the Massachusetts Fair Business Practices Act, Mass. Gen. Laws ch. 93A, § 11

(Count VIII).   They also seek declaratory relief (Count I).   Defendants counter-sue for breach of contract based on nonpayment (Counterclaim I), quantum meruit (Counterclaim II), breach of the implied covenant of good faith and fair dealing (Counterclaim III), and copyright infringement (Counterclaim VI).[1]

The Berylsons now move for summary judgment and declaratory relief on Count I, Counts II and III, and Counterclaims I, III, and VI.   Defendants cross-move for summary judgment on Counterclaims I and VI, as well as on Counts IV, V, and VII.

## BACKGROUND

1100 contracted with the Berylsons on July 6, 2016 (the Agreement), to provide architectural services for the renovation of their house at 38 Highgate Road in Wellesley, Massachusetts, and the expansion of the existing home into an adjacent lot at 44 Highgate Road (the Project).   In a letter summarizing the Project based on the parties' initial consultations, incorporated into the Agreement, 1100 gave a preliminary estimate of construction costs ranging from $10,575,000 to $12,740,000 (the Proposal), based on the assumption that the finished Project would involve an area of

---

[1] The court dismissed Counterclaims IV, V, and VII under Fed. R. Civ. P. 12(b)(6) earlier in this litigation.   *See* 1/12/2022 Order [Dkt # 55].

some 12,200 square feet.  Given the extent of the renovations, 1100 warned the Berylsons that the complexity of the Project made a firm initial estimate impossible.

The Agreement contemplated several phases at which the price of the Project (Cost of Work) could be recalculated: the Schematic Design Phase; the Design Development Phase; and the Construction Documents Phase. Having provided the Berylsons with the Proposal's estimated range of the Cost of Work, 1100 was to submit schematic design documents to the Berylsons for their approval.  The Berylsons' cost estimator was then to review the schematic design documents and provide a revised estimate of the Cost of Work.  Agreement [Dkt # 1-2] § 3.2.7.  Once the Berylsons approved the schematic design documents and gave authorization for adjustments in the Project and Cost of Work, the same process would be repeated during the Design Development and Construction Documents Phases.  *Id.* §§ 3.3.1-3.4.5.

In exchange for its oversight of the Project, 1100 was to receive an 18.5% fee over and above its Basic Services charges.  Basic Services included the management of the Project, consultations with the Berylsons, design criteria research, attendance at project meetings, communications with the Project team, progress reports to the Berylsons, coordination of 1100's

3

services with those of independent consultants and contractors hired directly by the Berylsons (Project Participants), and site master planning. *Id.* §§ 3.1-3.1.7; *id.* at Ex. 1.1 Attachment A. Any work that did not fall under the definition of Basic Services, and any work performed after thirty-nine months from the date of signing through no fault of 1100, was to be deemed Additional Services subject to an hourly rate charge.

After 1100 gave its initial estimate of the Cost of Work, 1100 and the Berylsons' project representatives gave John Berylson Project updates reflecting projected price increases. *See, e.g.*, Defs.' Statement of Facts [Dkt # 137] at 3 (recognizing the Project's increasing square footage). 1100's August of 2017 invoice revised the estimated Cost of Work to $12,500,000. Am. Compl. Ex. K [Dkt # 37-11]. Subsequent invoices reflect increases in the estimate to $14 million in November of 2017, $17 million in November of 2018, and $21 million in September of 2019. Am. Compl. Ex. L [Dkt # 37-12]; Am. Compl. Ex. N [Dkt # 37-14]; Am. Compl. Ex. O [Dkt # 37-15]. In April of 2020, the Berylsons' contractor, Berkshire Wilton Partners, LLC, estimated the Cost of Work to completion at $28 million. The parties dispute the cause of the spiraling price increases (in essence, whether 1100 negligently underrepresented the original price estimate or whether Amy

Berylson was to blame for requesting significant enlargements of the Project's scope).

On April 29, 2020, after having received the 1100's invoices for February and March of 2020, John Berylson believed he was being overcharged as 1100 had already invoiced 85% of its total expected Basic Services fees. He directed Celeste O'Neill, who administered the Berylsons' invoice payments, to review the invoices with 1100. He also called Piscuskas to object to 1100's fee charges. The parties discussed renegotiating 1100's fees from 18.5% of the Basic Service costs to 16% of any amount above $21 million. 1100 opted not to submit further invoices to the Berylsons until after a successful conclusion of the negotiations. On August 24, 2020, Piscuskas sent the Berylsons' attorney a letter acknowledging the fee dispute and identifying Additional Services that had not yet been billed. As of November 7, 2019, thirty-nine months after initialing the Agreement, 1100 began billing at its hourly rate. Despite the dispute, 1100 continued its work on the Project. On September 28, 2020, Piscuskas sent the Berylsons' attorney two invoices reflecting the proposed fee amendments. 1100 then sent invoices on October 14, 2020, December 8, 2020, and January 7, 2021, all of which remained unpaid.

The fee dispute discussions dragged on until February of 2021, when 1100 served the Berylsons with a Notice of Suspension of Services and Termination of Agreement, as well as a Demand for Arbitration. On March 4, 2021, 1100 formally terminated the Agreement. On March 15, 2021, 1100 sent a Notice of Termination to all Project Participants, stating that 1100 had terminated its services with the Berylsons because of the payment dispute and that the Berylsons' right to use 1100's designs, plans, drawings, specifications, reports, and related documents ("Instruments of Service") was also being terminated. The Berylsons subsequently retained new architects to complete the Project, to whom 1100 has sent cease and desist letters objecting to the use of 1100's Instruments of Service.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citation omitted). "To succeed, the moving party

must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## I.    Count I: Declaratory Relief

The Berylsons seek summary disposition of their request for declaratory judgment that: (1) 1100 could not lawfully terminate the Agreement for cause; (2) that 1100 did not rightfully terminate the Agreement for cause; (3) that 1100 could not lawfully terminate the Berylsons' license to use the Instruments of Service; (4) that the Agreement is not subject to expedited Fee Arbitration; and (5) that the expedited Fee Arbitration provision in the Agreement does not apply to invoices disputed as illegitimate.

Because, as discussed below, the court finds that genuine disputes of material fact remain as to the Count II and Counterclaim VI, the court will deny summary judgment on the first through third requests. Having already disposed of the parties' dispute as to whether the Agreement is subject to expedited arbitration, *see* 4/2/2021 Order [Dkt # 15], the fourth request for

declaratory judgment is moot.  The court also declines to grant summary judgment on the fifth claim as unsupported by the Berylsons' briefing.

## II.    Count II: Breach of Contract

The Berylsons seek partial summary judgment as to liability on their breach of contract claims.  They allege three ways in which 1100 materially breached the Agreement: (1) by inflating the Cost of Work to include the work of contractors whom the Berylsons directly hired; (2) by billing the Berylsons for Additional Services without their written authorization; and (3) by improperly terminating the Agreement during the protracted fee dispute.  As detailed below, the court will deny summary judgment on all three theories.

### a. Including Contractor Work in Cost of Work

First, the Berylsons argue that 1100 overbilled them by including the work of the Berylsons' own contractors in the Cost of Work.  The Berylsons argue that their own contractors (not 1100) designed and specified certain Project elements such as underpinning, electrical systems, and mechanical systems.  Despite this, 1100 allegedly included these elements in its Cost of Work, inflating its profits.

Defendants argue that while the Berylsons directly contracted with other consultants, the design of the Project – including the specification of the elements and materials used – could not be done in a vacuum, and that

1100 "coordinated the efforts and approved designs and specifications" of the Berylsons' other design consultants.  Defs.' Resp. to Pls.' Statement of Facts & Additional Statement of Facts (Defs.' Resp. SOF) [Dkt # 121-3] ¶¶ 7-9. Piscuskas testified that 1100 coordinated with the Berylsons' mechanical, electrical, and plumbing engineering consultant, landscape architect, structural engineer, geotechnical engineer, and façade engineer.  Defs.' Opp'n Ex. 51 [Dkt # 121-8] at 227-229.

The Agreement states that the Cost of Work would include 1100's "Basic Services" but "does not include the compensation of the Architect, any consultants and Interior Designer."   Agreement § 6.1.   However, the Proposal, incorporated in the Agreement, provides that "Basic Services" would also include "Consultant coordination" over and above the items listed in the Agreement.  *Id.* at Exhibit 1.1, Attachment A.  Given the ambiguity in the wording of the incorporated Proposal's provision for "Consultant coordination" billing, construed in the light most favorable to the non-moving party, there is a sufficient genuine dispute of material fact to warrant a denial of summary judgment under this first theory of breach of contract.

### b. Including Additional Services in Invoices without the Berylsons' Consent

As a second theory, the Berylsons argue that 1100 breached the Agreement when it began billing them for Additional Services performed

after November 7, 2019, on an hourly basis without obtaining prior written authorization.  The operative language of the Agreement provides that "[i]f the services covered by this Agreement have not been completed within thirty-nine (39) months of the date of this Agreement, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as Additional Services."  *Id.* § 4.3.3.

1100 admits that for some of the Additional Services billed, 1100 received only verbal approval instead of a writing as specified in the Agreement.  Defs.' Resp. SOF ¶ 37; Agreement § 4.1.  However, 1100 states that the Berylsons had timely paid all its invoices from July of 2016 to January of 2020 without questioning any charges for Additional Services or insisting on proof of a written approval.  Defs.' Opp'n Ex. 47 [Dkt # 121-4] ¶ 12.  This undisputed assertion raises a material dispute of fact of whether the Berylsons tacitly waived this claim by acquiescing to the billings.  *See BourgeoisWhite, LLP v. Sterling Lion, LLC*, 91 Mass. App. Ct. 114, 119 (2017), citing *Dynamic Mach. Works, Inc. v. Machine & Elec. Consultants, Inc.*, 444 Mass. 768, 771 (2005).

For the portion of the Additional Services rendered after the thirty-nine-month mark, defendants produce evidence sufficient to create a genuine dispute of material fact whether 1100 bore responsibility for the

delay pushing the project past the thirty-nine-month mark.  In September of 2020, Richard Roberts, the Berylsons' representative, told Piscuskas and John Berylson that 1100's drawings contained 90% of what was needed to complete the Project, but that the "missing 10%" consisted of items "that Amy need[ed] to decide on with the help of 1100.  That has been lingering now since last May and even last week Amy said she wanted to revisit items previously decided."  Defs.' Opp'n Ex. 79 [Dkt # 121-36]; *see also id.* (noting that "helping Amy make these decisions," in addition to coming to some terms of agreement with 1100, would fix the Projects "state of semi-paralysis").  Roberts's statement supports the inference that Amy Berylson's indecision and constant revisiting of old decisions contributed to the Project's delay by several months.

Additionally, defendants also point to the Town of Wellesley's initial determination that 44 Highgate qualified as an historic property as the source of delay in issuing a demolition permit for the Project.  A Town of Wellesley bylaw, which became effective after the Berylsons had purchased 44 Highgate, required a twelve-month waiting period for the demolition of "Eligible Buildings," defined as any dwelling built on or before December 31, 1949.  Wellesley's town planner had initially determined 44 Highgate to be an Eligible Building.  Defs.' Opp'n Ex. 93 [Dkt # 121-50] at 2-5.  The

Berylsons eventually appealed the determination to the Wellesley Historical Commission and obtained a finding that the home was not built on or before December of 1949. *Id.* at 4; Defs.' Resp. SOF ¶ 82. The Berylsons do not dispute that the Project's schedule was impacted by the appeal. Pls.' Resp. to Defs.' Additional Statement of Facts [Dkt # 132] at 65.

Finally, defendants contend that the Project was delayed in part because of the Berylsons' extended contract and fee negotiations with their first general contractor, Sea-Dar, which extended over several months. Drawing all reasonable inferences in their favor, the defendants raise a genuine issue of whether the Berylsons' negotiations with Sea-Dar caused at least some of the delay. Despite the Berylsons' claim of "due diligence" in determining that Sea-Dar "was arguably the only potentially qualified Contractor to bid the Project," Sea-Dar was not hired until December of 2017, and did not receive a limited Notice to Proceed until July 27, 2018. *See Am. Compl.* ¶¶ 114-117 (describing the Berylsons' consideration of the contractors that entered bids for the Project but noting that out of the only other three bidders, two "lacked the requisite skill and experience" and one was eliminated because it did not arrange access for the Berylsons for in-person visits); Notice to Proceed [Dkt # 37-5]. The Berylsons do not dispute that the

Project was delayed at least in part by the Sea-Dar negotiations.  Pls.' Resp.
to Defs.' Additional Statement of Facts at 65.

### c.  Improperly Terminating the Agreement

Finally, the Berylsons argue that 1100 breached the Agreement by
terminating it while the parties were still in the midst of the fee dispute.  The
Agreement states that "[t]he Architect shall continue to perform its services
hereunder during any claim, dispute or proceeding between the parties
hereto as if such claim, dispute or proceeding had not been instituted;
provided that Owner continues to make payments to Architect for those
items not in dispute."  Agreement § 8.1.4.  Under the plain language of the
Agreement, 1100 was required to continue its performance.

Defendants argue that the Berylsons did not provide formal notice of
the fee dispute sufficient to trigger its obligation of continued performance.
However, the Berylsons provide evidence that they did dispute 1100's
invoices.  *See, e.g.*, Pls.' Statement of Fact Ex. 17 [Dkt # 111-17] (May 12, 2020
email from the Berylsons' financial representative to 1100 stating that John
Berylson requested that they review the invoice together, with subsequent
emails noting that the representative wanted to verify the bill's accuracy).
The Agreement does not require the Berylsons to dispute the invoices in any
specific manner beyond the giving of written notice, nor does it require the

13

Berylsons to articulate grounds for why they believe an invoice is inaccurate. Agreement § 8.1.4.  Barring any additional contractual definition of how the Berylsons were to manifest a billing dispute, the court will rely on a plain language understanding of the term "dispute."  To "dispute" is defined as "to call into question or cast doubt upon."  *Dispute*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dispute.        The    court concludes that the example provided by the Berylsons constituted sufficient notice of the fee dispute – the representative identified in writing that the Berylsons questioned the invoice amount.

Defendants argue that, while the Berylsons have characterized the issue as a billing dispute, the dispute between the parties is attributable to a scheme by the Berylsons to leverage the economic difficulties facing Project workers precipitated by the COVID-19 pandemic.  Defendants provide voicemails of John Berylson citing COVID-19-related job loss and reductions in home building as advantageous reasons to re-negotiate their fee arrangements with Project participants, lest a contractor "can go apply to the federal government for welfare for about three months, and then he can start feeding his children Cheerios for dinner, breakfast, and uh, lunch."  Audio Recording of Defs.' Opp'n Ex. 59 [Dkt # 121-16] at 2:03-2:12.  But expressing

a desire, even in crude terms, to renegotiate the terms of a contract does not amount to a breach.

While 1100 terminated the Agreement contrary to its terms,[2] the court will deny summary judgment with respect to liability on this theory of breach, pending the jury's determination of whether the Berylsons' earlier breach of contract, as discussed below, was a material breach and accordingly excused further performance by 1100. *See Ward v. Am. Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100-101 (1983) ("It is well established that a material breach by one party excuses the other party from further performance under the contract.").

### III.   Count III: Breach of the Implied Covenant of Good Faith and Fair Dealing

The Berylsons also seek partial summary judgment as to liability for their claim that 1100 violated the implied covenant of good faith and fair dealing by failing to perform the Agreement in good faith.  The Berylsons claim that 1100's termination of the Agreement breached this covenant as a

---

[2] While this interpretation would in effect require 1100 to perform in perpetuity without payment so long as the Berylsons dispute each subsequent invoice, the court is confined to the language of the Agreement, which provides no time limit for 1100's obligation to continue performing. The proper avenue for remedy for what could create an unfair outcome would be an equitable claim of quantum meruit.

matter of law because it unnecessarily delayed the construction of their home.

"Every contract implies good faith and fair dealing between the parties to it." *Warner Ins. Co. v. Comm'r of Ins.*, 406 Mass. 354, 362 n.9 (1990), quoting *Kerrigan v. Boston*, 361 Mass. 24, 33 (1972). To prove a violation, there is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith. *See Robert & Ardis James Found. v. Meyers*, 474 Mass. 181, 189, 191 (2016). Want of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." *Hartford Acc. & Indem., Co. v. Millis Roofing & Sheet Metal, Inc.,* 11 Mass. App. Ct. 998, 999-1000 (1981). Deciding on claims of breach of the implied covenant of good faith and fair dealing at the summary judgment state is rarely appropriate because the issue requires a determination of motive and state of mind. *See Okerman v. Va. Software Corp.*, 2003 WL 21960599, at *6 (Mass. Super. Ct. July 9, 2003), *vacated in part on other grounds*, 69 Mass. App. Ct. 771 (2007).

Granting summary judgment is particularly inappropriate here, where the Berylsons have not proffered any evidence of 1100's state of mind or

motive.[3]  The Berylsons merely assert that 1100 knew that it had a good-faith obligation to avoid any risk of delaying construction and, by terminating performance, needlessly created such a delay.  *See* Pls.' Mem. Supp. Summ. J. [Dkt # 110] at 28-29; *see also* Pls.' Reply Br. [Dkt # 131] at 4 (similarly claiming 1100 acted in bad faith but offering no evidence to support the claim).  Without any evidence of lack of good faith, this claim is essentially a restatement of the breach of contract claim, with particular focus on the alleged breach's effect.  But the implied covenant typically requires more than a mere breach of contract.  *See Targus Grp., Inc. v. Sherman*, 76 Mass. App. Ct. 421, 435-435 (2010).  Accordingly, the court denies summary judgment on this count.

## IV.   Count IV: Fraud in the Inducement

Defendants move for summary judgment on the Berylsons' claim that defendants fraudulently induced them to enter the Agreement by knowingly low-balling the estimated costs of the Project.  Specifically, the Berylsons take issue with the fact that the estimated cost of the Project ballooned from

---

[3] By contrast, defendants point to 1100's continuing work on the Project during a year of nonpayment by the Berylsons as evidence of its good faith.  *See* Pls.' Statement of Additional Facts [Dkt # 40] ¶¶ 29-31 (listing the Berylsons' first disputed invoice as the February and March of 2020 invoice and 1100's suspension of services in February of 2021).

1100's initial cost estimate range of $10,575,000 to $12,740,000 to over $28 million.

To establish fraud in the inducement, the Berylsons must show that: "1) that the defendant made a false representation of material fact, 2) with knowledge of its falsity, 3) with the purpose of inducing the plaintiff to act thereon and 4) that the plaintiff relied upon the representation to his detriment." *Berwind Prop. Grp. Inc. v. Env't Mgmt. Grp., Inc.*, 2007 WL 4707647, at *3 (D. Mass. Feb. 5, 2007).

The Berylsons falter at the first element because they fail to establish that 1100's initial estimate was a false representation of material fact. The initial appraised price range was an estimate and was described as such in the Agreement and the Proposal. *See* Agreement § 6.8 ("The Architect makes no warranty, express or implied, that the bids or negotiated cost of the Work will not vary from the Architect's opinion of probable construction cost."); *id.* at Ex. 1.1 (stating that the preliminary construction budget appraisal is a "general approximation"). The Proposal also expressly warned the Berylsons that the estimated cost could possibly increase based on a multitude of unpredictable factors. *Id.* at Ex. 1.1 ("Respectfully, we forecast several complex conditions will arise from [the renovation] aspect of the project, many of which cannot be fully assessed and quantified at this time."); *see*

*also* Piscuskas Aff. [Dkt # 144-17] ¶¶ 18-19 ("The figures shown in the . . . Proposal merely outline a general budgetary approximation of cost in terms of total square footage . . . and approximate per square foot construction costs in Massachusetts based on my understanding of then current market factors.  It was not possible . . . to estimate with any degree of certainty what the actual and ultimate cost, size, or material nature of the project would because as of that time no formal design meetings with the client had occurred.").

The Berylsons argue that a statement of opinion may still be actionable if the speaker possesses superior knowledge of the subject matter to which the misrepresentations relate.  This is true; "a statement in the form of an opinion may be actionable as a statement of material fact if the representation is false and the subject matter is one susceptible of actual knowledge." *Nota Constr. Corp. v. Keyes Assocs., Inc.*, 45 Mass. App. Ct. 15, 17 (1998).

The Berylsons argue that here defendants indisputably had superior knowledge of the cost of construction, and that they did in fact know that the Project would cost far more than forecast in the initial budget proposal.  To support this claim, the Berylsons rely on the opinion testimony of Paul Reiss, the Berylsons' general contractor who worked with 1100 on the Project.

Reiss Aff. [Dkt # 124-5] ¶¶ 5, 7.  Reiss testified that, while 1100 gave the Berylsons a quote that amounted to an average square footage cost of between $840 and $1,040, he personally would have "quoted at least $1,200-$1,300 on a gross square footage basis." *Id.* ¶ 31.  He also stated that 1100's numbers were flawed because even assuming a $1,000 per square foot cost, "which was low in 2016," the cost of the Project would have been $18 million. *Id.*

Under the circumstances, Reiss's opinion, standing alone, does not create a genuine dispute of material.  While Reiss's architectural design and construction experience appears extensive, his affidavit establishes no more than that he personally would have given a higher quotation, and that 1100's estimate was "low." *Id.*  It does nothing to permit any convincing conclusion that the defendants knew that their estimate was unrealistic as opposed to simply proving to be wrong.  Nor does it establish that 1100's initial estimate was knowingly out of step with industry knowledge and practice, only that it deviated from Reiss's own opinion.

Reiss's affidavit also does not touch upon whether he, or 1100, could have given a more accurate cost projection given the "complex conditions" 1100 warned could arise.  1100 stated at the outset that a precise budget estimate was not susceptible to actual knowledge because the potential

complications that might arise "could not be fully assessed and quantified at this time."  Agreement at Ex. 1.1.  The Berylsons offer nothing substantive in response, except to suggest that Piscuskas's experience should have given him a more fulsome insight into such unknowns.  Pls.' Opp'n [Dkt # 120] at 7.

Because the initial estimated price range on which the Berylsons rest their fraud in the inducement claim was an opinion – of which the subject matter was not susceptible of actual knowledge in its fullest sense – defendants' motion for summary judgment on this claim will be granted.

## V.    Count V: Fraud

Defendants also object to the Berylsons' claim that, after the parties signed the Agreement, defendants fraudulently represented that the Project would not cost more than $16.4 million.  As the elements of common law fraud and fraud in the inducement are the same, *see Katz v. Belveron Real Est. Partners, LLC*, 28 F.4th 300, 310 (1st Cir. 2022), the court will rely on the test it previously identified.

The Berylsons cannot establish the last element, that they relied on the alleged representation to their detriment, because 1100 apprised their agent, Robert Carlson, of the escalating costs as early as July of 2018.  The Berylsons argue that, although defendants represented to them that the Project would

cost no more than $16.4 million, defendants had knowledge that the Project cost was at risk of increasing by at least $3.32 million because Sea-Dar identified the potential increases in a Risk and Exposure Log dated July of 2018.  But it is undisputed that Carlson, who asked Sea-Dar to create the Risk and Exposure Log, contemporaneously reviewed the log, as well as the revised versions circulated on July 24, 2018, and October 23, 2018.  Muniz Aff. Ex. 13 [Dkt # 114-13] at 203; Muniz Aff. Ex. 27 [Dkt # 114-27] at 3; Muniz Aff. Ex. 28 [Dkt # 114-28]; Muniz Aff. Ex. 29 [Dkt # 114-29].

As an agent of the Berylsons, Carlson's knowledge is imputable to them.  *United States v. President and Fellows of Harv. Coll.*, 323 F. Supp. 2d 151, 201 (D. Mass. 2004) ("The general rule in Massachusetts is that a principal is liable for an agent's knowledge acquired in the scope of employment.").  Under Massachusetts law, an agency relationship arises where three elements exist: "1) the agent's power to alter the legal relationships between the principal and third parties; 2) a fiduciary relationship toward the principal regarding matters within the scope of the agency; and 3) the principal's right to control the agent's conduct in matters within the scope of the agency."  *CNE Direct, Inc. v. Blackberry Corp.*, 821 F.3d 146, 150 (1st Cir. 2016).  While the existence of an agency relationship is ordinarily a question of fact, *Shear v. Gabovitch*, 43 Mass. App. Ct. 650,

670 (1997), "the question of agency becomes one of law in those instances where the relationship is found to exist on the basis of undisputed facts or unambiguous written documents," *Brown-Forman Corp. v. Alcoholic Beverages Control Comm'n*, 65 Mass. App. Ct. 498, 503 (2006).

The contract between Carlson and the Berylsons for Carlson's services as an Owner's Representative clearly defines a principal-agent relationship. Muniz Aff. Ex. 14 [Dkt # 114-14].  Carlson's ability to "[p]rovide on-site construction oversight, technical review of change order requests and applications for payment, and closeout of contracted work" is one example of Carlson's authority to alter the Berylsons' legal relationships with the other Project participants. *Id.* ¶ 2.  Carlson's scope of service, which includes "[r]epresent[ing] the [Berylsons'] interests during the construction and closeout phases of the project," "review[ing] the work in progress," and "[r]eviewing schedules and cost estimates submitted by the contractor to ensure that the timing and construction costs are within schedule and budget," demonstrates the fiduciary nature of the relationship between Carlson and the Berylsons.  *Id.*  Finally, the entire structure of the arrangement, with Carlson serving as a representative for the Berylsons on their construction project and his obligation to "[n]otify [the Berylsons] of any significant discoveries that might . . . affect [their] decisions regarding

23

the property," demonstrates that the Berylsons exercised control over Carlson. *Id.*

The Berylsons argue that the general rule that an agent's knowledge is imputed to the principal "does not apply when the third party knows there is no foundation for the ordinary presumption," and where the third party "is acquainted with circumstances plainly indicating that the agent will not advise his principal." *Mut. Life. Ins. Co. of N.Y. v. Hilton-Green*, 241 U.S. 613, 622-623 (1916). However, the evidence they proffer is insufficient to establish that defendants knew that there was no foundation to assume Carlson would fail to report material facts to the Berylsons. They offer emails between Robert Lipson, a senior project manager at 1100, and Carlson in which Carlson states that "[i]t was made clear to me that on [the Berylsons' daughters' construction project], 1100 is totally in charge of change orders and their approvals and I believe this to be true on [the Project]. I am here to assist with reviews only." Pls.' Counter Statement of Facts Ex. 88 [Dkt # 125-41] at 2. Carlson's own belief that 1100 had sole authority over change orders because of his experience on a different construction project does not amount to a plain indication that 1100 knew Carlson would not keep the Berylsons informed of progress on their project. In the email Carlson stated that he was still "assist[ing] with reviews," and he did eventually alert John

Berylson that the Risk and Exposure Log warned that the Project cost could increase to up to $ 21.5 million.  Muniz Aff. Ex. 13 at 206.

Because the Berylsons, through Carlson, their agent, knew of the price increases as they occurred, they cannot establish that they relied on 1100's alleged misrepresentations.  The court will grant summary judgment on this count in favor of defendants accordingly.

## VI.    Count VII: Tortious Interference

Defendants seek a brevis judgment on the Berylsons' claim that they intentionally interfered with the Berylsons' business relationships with their other Project Participants by sending a Notice of Termination on March 15, 2021, as well as cease and desist letters on January 5, 2022, and August 12, 2022, to the architects that replaced 1100.  Defendants argue that the litigation privilege bars the Berylsons' claim because the statements were made "in the institution or conduct of litigation and other communications preliminary to litigation."  *Sriberg v. Raymond*, 370 Mass. 105, 109 (1976). The litigation privilege is absolute, providing "a complete defense even if the offensive statements are uttered maliciously or in bad faith."  *Doe v. Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 140-141 (1996).  However, as the Berylsons point out, the absolute litigation privilege does not apply to defendants' circulation of the Notice of Termination because it was sent to

Project participants while defendants were seeking expedited arbitration, which this court has previously determined was not commenced in good faith. *See* 4/2/2021 Order. Because a determination of bad faith or malice is a factual inquiry typically reserved for the jury, the court will deny defendants' summary judgment motion with respect to the Notice of Termination.

However, the same cannot be said for the cease and desist letters sent to Lee F. Mindel, Architect, D.P.C. (Mindel) and Martin Partners Architecture + Design LLP (MPAC). These letters, sent on January 5, 2022, and August 12, 2022, respectively, were sent after litigation was well underway and are pertinent to the judicial proceeding because they relate directly to defendants' copyright counterclaim. *See* Muniz Aff. Ex. 32 [Dkt # 114-32]; Muniz Aff. Ex. 33 [Dkt # 114-33]. While the privilege cannot be used as a shield if the proceeding is not contemplated in good faith, the Berylsons offer insufficient support for their assertion that defendants brought their copyright infringement claim in bad faith in response to the lawsuit the Berylsons initiated.

The court will consequently grant summary judgment in favor of defendants with respect to liability on this count with respect to the cease-and-desist letters sent to architects Mindel and MPAD, but will deny

summary judgment as to liability concerning the Notice of Termination sent in March of 2021.

## VII.  Counterclaim I: Breach of Contract

The parties cross-move on defendants' counterclaim that the Berylsons breached the Agreement by not paying over $1.3 million in outstanding invoices to 1100 and failing to properly escrow the disputed sums according to the terms of the Agreement.  The Agreement requires that "[a]ny amounts in dispute shall be held by the Owner's counsel in a non-interest bearing commercial bank account and shall be deposited upon written notice of dispute by Owner."  Agreement § 8.1.4.

After reviewing the Berylsons' bank records submitted under the court's order for an *in camera* review, the court finds that, while the Berylsons did not strictly follow the terms of the Agreement for securing the disputed amounts, the defendants have not established that the Berylsons' breach was material.  A breach is material when the breach is "of an essential and inducing feature of the contract[]."  *Buchholz v. Green Bros. Co.*, 272 Mass. 49, 52 (1930).

Here, the records of the account produced for the court's inspection, described as a "trust for Amy Berylson's benefit," suggest that the Berylsons did not promptly make deposits into the account after disputing each invoice,

27

as required by the Agreement.  Additionally, neither the Berylsons nor their custodian demonstrate that the account is non-interest-bearing or commercial in nature, also required by the Agreement.  Rather, the account in question appears to be a trust account that already contained sufficient funds to pay 1100 the full disputed amount during the relevant period.

Here, even if the Berylsons did not square the corners in complying with the terms of the Agreement, the bank records indicate that during the periods when the Berylsons disputed 1100's invoices, the account always contained sufficient funds to pay 1100 the full disputed amount if required to do so.  The question, reserved for the jury, is whether depositing the amount in question materially satisfied the Berylsons' contractual obligations to 1100.  *See Hastings Assoc., Inc. v. Local 369 Building Fund, Inc.*, 42 Mass. App. Ct. 162, 171 (1997) ("Whether there is . . . a material breach is a question for the jury.").

The Berylsons' motion for summary judgment on the counterclaim contends as a matter of law that defendants first materially breached the Agreement by improperly inflating the invoices.  *See* Pls.' Mem. Supp. Summ. J. at 10, 16-17.  Because the court is denying summary judgment for the Berylsons' on Count I on that theory, *see supra* Section II(a); Section

28

II(b), the court consistently will deny summary judgment to the Berylsons on this claim as well.

## VIII.   Counterclaim III: Breach of the Implied Covenant of Good Faith and Fair Dealing

As with their breach of the implied covenant of good faith and fair dealing claim, the Berylsons also move for summary judgment on defendants' parallel counterclaim.   Defendants claim that the Berylsons stopped paying 1100 to limit their costs and initiated this litigation in bad faith.   Similarly, as with respect to Count III, the court will deny summary judgment here because the determination of the Berylsons' state of mind is "unsuited for summary judgment."   *Targus*, 76 Mass. App. Ct. at 436; *see also Flesner v. Tech. Commc'n Corp.*, 410 Mass. 805, 809 (1991) ("In cases where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate.").   This is particularly so because the Berylsons offer no specific evidence of their own good faith or lack of bad faith to support their motion.

## IX.  Counterclaim VI: Copyright Infringement

Both parties move for summary judgment on defendants' counterclaim that the Berylsons have infringed on 1100's copyright by continuing to use 1100's Instruments of Service after 1100 terminated the Agreement.   The Agreement granted the Berylsons a non-exclusive, perpetual, and irrevocable

license to use the Instruments of Service for the Project, but stated that this license would terminate if 1100 "rightfully terminate[d]" the Agreement because the Berylsons either failed to make undisputed payments in accordance with the Agreement or if they substantially failed to perform the terms of the Agreement through no fault of 1100.  Agreement §§ 7.2, 9.1, 9.5.

As the parties agree, the outcome of this issue turns on the question of whether 1100 "rightfully terminated" the agreement with the Berylsons. Because the court has denied summary judgment on the Berylsons' claim that 1100 breached the Agreement by terminating it during the fee dispute, the court will deny the parties' reciprocal motions for summary judgment on this counterclaim.

**ORDER**

For the foregoing reasons, summary judgment will be <u>ALLOWED</u> in favor of defendants with respect to Counts IV and V.  Partial summary judgment is <u>ALLOWED</u> in favor of defendants as to Count VII.  The Clerk will enter summary judgment on the identified Counts and set the balance of the case for trial.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE